UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK


GUSTAVO SANTOS,            *     Case No. 16-CV-7107(DLI)
                           *
          Plaintiff,   *     Brooklyn, New York
                           *     August 21, 2018
    v.                *
                           *
E T & K FOODS INC., et al.,  *
                           *
          Defendants.   *
                           *

* * * * * * * * * * * * * * * *

TRANSCRIPT OF CIVIL CAUSE FOR STATUS CONFERENCE
BEFORE THE HONORABLE VERA M. SCANLON
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:         VINCENT E. BAUER, ESQ.
                         Law Offices of Vincent E.
                          Bauer
                         112 Madison Ave., 5th Fl.
                         New York, NY  10016

                         JACOB ARONAUER, ESQ.
                         The Law Offices of Jacob
                         Aronauer
                         225 Broadway, Suite 307
                         New York, NY  10007

For the Defendants:        SEAN J. KIRBY, ESQ.
                         Sheppard Mullin Richter &
                         Hampton, LLP
                         30 Rockefeller Plaza
                         39th Floor
                         New York, NY  10112


Proceedings recorded by electronic sound recording, transcript produced by transcription service.


**Fiore Reporting and Transcription Service, Inc.**
**4 Research Drive, Suite 402**
**Shelton, Connecticut 06484 (203)929-9992**

2

1           (Proceedings commenced at 10:34 a.m.)

2               THE COURT:  All right.  Santos v. E T & K Foods,

3       Inc., 16-CV-7107.

4               So let's start with plaintiff counsel.

5               MR. BAUER:  Vincent Bauer on behalf of Mr. Aronauer.

6               MR. ARONAUER:  Jacob Aronauer.  Good morning, Your

7       Honor.

8               THE COURT:  Good morning.  And for defendants?

9               MR. KIRBY:  Good morning, Your Honor.  Sean Kirby on

10      behalf of all defendants.

11              THE COURT:  All right.  So this is the follow up to

12      the hearing we had with the various questions about the

13      settlement in this case.  So we had the hearing on the 28th.

14      The transcript -- have you all seen it?

15              MR. BAUER:  Yes, Your Honor.

16              MR. KIRBY:  Yes, Your Honor.

17              THE COURT:  All right.  So it's on the docket at 60.

18              So take a look at this.  I'm not sure who goes first

19      in this, on the one hand.  The plaintiff, you wanted -- I'm

20      not sure.  I'm not sure who.  Let's just start with plaintiff.

21      Might as well.

22              MR. BAUER:  Okay.  Very well, Your Honor.  And I

23      understand that the issue of sanctions was --

24              THE COURT:  So, it's --

25              MR. BAUER:  -- taken out of the purview now?

1          THE COURT:  Yes.

2          MR. BAUER:  Very good.  Would it be all right if I

3    sat, because it's hard for me to stand, look at you, and refer

4    to my notes.

5          THE COURT:  Yeah, yeah, that's fine.

6          MR. BAUER:  Okay.

7          THE COURT:  Unless you'd prefer the podium.  But

8    that's fine.  Just pull a microphone closer.

9          MR. ARONAUER:  Great.

10          THE COURT:  Thanks.

11          MR. BAUER:  Okay.  So, Your Honor, we submit that

12    there are three issues to be addressed today.

13          The first of which is the question of whether the

14    parties reached a settlement.  It seems plain from the

15    testimony that an agreement was reached, whereby an exchange

16    for $45,000, plaintiff would sign a document instructing his

17    attorney, Mr. Aronauer, to withdraw the action.  So we

18    believe, you know, there was an agreement.

19          The second issue is whether the settlement was fair

20    to the plaintiff.  Respectfully, we don't take a position with

21    respect to that issue since we weren't involved in the

22    settlement.

23          The third issue is whether the -- the settlement

24    agreement between plaintiffs and defendants was a global

25    agreement settling both plaintiff's claims and a claim for

1    attorney's fees.

2         As the Court is aware, the evidence regarding that

3    question is as follows.  Mr. Kaller testified that in August

4    2017, he ran into Plaintiff Santos, who wanted to speak with

5    him.  He then went with Plaintiff Santos to a Chinese bakery,

6    where Santos told him he wanted to settle the case but had to

7    speak with his lawyer.  Kaller further testified that he was

8    again contacted by Mr. Santos, who asked him to come to

9    Santos's home.

10         During that meeting, Santos told Kaller that he had

11   spoken with his lawyer, who said that he needed $16,000 in

12   attorney's fees in connection with the settlement.

13         According to Kaller, Santos specified that he

14   personally needed $29,000 in settlement and that he needed

15   another $16,000 for his lawyer.

16         Kaller claims to have paid Santos that amount on the

17   spot.  Kaller further testified that Santos thereafter

18   contacted him and told him that he had gone to see Mr.

19   Aronauer, who was unavailable, but that someone from Mr.

20   Aronauer's office told him that he did not have to pay money

21   to Mr. Aronauer.

22         Thereafter, while at the same meeting with Mr.

23   Santos, Santos received a phone call from Mr. Aronauer.

24   Again, this is according to Mr. Kaller who, according to Mr.

25   Santos, told Mr. Santos that he didn't want any money, but

1    that Mr. Santos needed to come see Mr. Aronauer.

2           Kaller then testified that upon hearing that Mr.

3    Aronauer did not wish to be paid money in connection with the

4    settlement, Kaller asked Santos for the $16,000 -- excuse me,

5    $16,000 back.

6           According to Mr. Kaller, Mr. Santos did not respond

7    at all to that request and Mr. Kaller did not pursue the issue

8    further.

9           We submit, Your Honor, that the record is devoid of

10   any evidence that a global settlement was reached by the

11   parties.

12          First, the documentary evidence produced by

13   defendants does not demonstrate that a global settlement was

14   agreed to.  Neither a release of claims, nor settlement

15   agreement was signed by the parties to the settlement.

16      Instead, it was testified that defendants would pay

17   plaintiff $45,000 in exchange for plaintiff signing a letter

18   instructing Mr. Aronauer to withdraw the suit.  And a similar

19   letter to Mr. Kaller to the effect that plaintiff wished to

20   withdraw his claims.

21          These documents though, did not support the position

22   of defendants that a global settlement was reached by the

23   parties.  The letters directed to plaintiff's counsel do not

24   state that Santos was releasing all potential claims against

25   Kaller, nor did they mention attorney's fees at all.

1          Defendant Kaller's hearing testimony, if it were to

2     be believed, might support the notion that the parties

3     effected a global settlement of Santos's claims, as well as a

4     claim for attorney's fees.  The testimony, however, is simply

5     not credible.

6          First, Mr. Kaller's testimony about how he ran

7     across plaintiff is suspect.  In that regard, he testified

8     that Santos lives right near Met Foods.

9          Yet he wants you to believe that Mr. Santos did not

10    reach to him until he saw him on the street, you know, driving

11    by, at which point Santos indicated that he wanted to talk.

12    It makes no sense that Mr. Santos, if he wanted to revive the

13    settlement that had previously taken place, would wait until

14    he ran across Mr. Kaller in order to do that.

15          Next, Kaller testified when he spoke to Santos in

16    the Chinese bakery, Santos apologized for giving the money

17    back and said that he wanted to settle the case and move to

18    Mexico, but he had to speak to his lawyer first.  That's it.

19    That's what Mr. Kaller testified was discussed at the Chinese

20    baker.  Nothing about a settlement amount greater than

21    $20,940, the amount that was previously given to Mr. Santos

22    and then given back.

23          And yet, when Kaller meets Santos the next day, he

24    brings $50,000 in cash.  Not 21,000.

25          Now why would someone who thought he had a deal at

7

1    20,000 and change, expected a person who apologized for

2    backing out of that deal and indicating that he wanted to

3    settle, would ask for more than twice the original agreed upon

4    amount?  It makes no sense.

5         Next, Kaller testified that when he again met Santos

6    at Santos's home, Santos told him that his lawyer wanted

7    16,000 in settlement, but was fine with Santos settling the

8    case directly with defendants without Mr. Aronauer's

9    involvement.

10         The testimony suggests that Mr. Aronauer, upon

11   hearing from his client that Mr. Kaller had once again

12   attempted to settle this action without the benefit of his

13   counsel's involvement said effectively, gee, okay, good luck

14   with that; just give me $16,000.  It's preposterous.  We all

15   know that Mr. Santos never said that to Mr. Kaller.

16         A simple review of the docket in this case would

17   reveal that such a response from Mr. Aronauer would be

18   entirely unlikely, given his furious efforts to prevent the

19   parties from settling without counsel's involvement prior to

20   this supposed discussion.

21         Additionally, Mr. Kaller testified that Mr. Santos

22   had said that Mr. Aronauer was so upset about the prospect of

23   Mr. Santos settling the case around him, Santos was worried

24   that Mr. Aronauer might take action against his family.

25         That sort of threat would be entirely inconsistent

1    with a subsequent decision by Mr. Aronauer to allow Santos to

2    settle the case by itself.  Thus, it seems clear that Mr.

3    Kaller has made up that portion of his testimony.

4            Similarly, Kaller testified that thereafter, Santos

5    told him that he was first told by Mr. Aronauer's staff, and

6    then by Mr. Aronauer himself, that Mr. Aronauer had

7    essentially changed his mind and no longer wanted $16,000 or

8    any amount in attorney's fees.

9            The idea that Mr. -- that Mr. Aronauer, or really

10   any plaintiff's side attorney, particularly after indicating

11   that he needed $16,000 in attorney's fees in connection with

12   the settlement would say, well gee, never mind, makes no sense

13   at all.  It's preposterous.

14           Moreover, Kaller's suggestion that after agreeing to

15   pay Santos $29,000, and Mr. Aronauer $16,000, and was told

16   that Mr. Aronauer didn't want his money, made no meaningful

17   effort to get the $16,000 back, is -- that's not a reasonable

18   suggestion.

19           He testified in that regard that he asked Santos

20   whether he should give him the $16,000 back, since he had just

21   indicated that Mr. Aronauer was waiving his fees.

22           He said that Mr. Santos did not respond and the two

23   never spoke again, and he's never seen him since.  It makes no

24   sense under those circumstances that Mr. Kaller, who pretty

25   plainly was negotiating with Mr. Santos in an effort to get a

1    better deal than he thought he could get, you know, operating

2    through the attorneys, would have aggressively sought to get

3    that $16,000 back, if he had an agreement with Mr. Santos that

4    he was going to give him $29,000, and he was going to give

5    counsel an additional 16.  He wouldn't just say, well fine,

6    take the 45 and go on.  It makes no sense whatsoever.

7           Mr. Aronauer testified credibly that at no point in

8    August, 2017 did he speak with Santos about an amount of

9    attorney's fees that he needed, nor did Santos arrive at his

10   office to provide attorney's fees to Mr. Aronauer.  So, you

11   know, that is credibly rebutted.

12          We further know the story contrived by defendants is

13   not realistic because the prior two instances of an attempted

14   payoff by Kaller.  As Defendant Kaller testified during the

15   first hearing with respect to these issues, when he tried to

16   directly pay Mr. Santos $10,000, there was no discussion of

17   attorney's fees.

18          Also in connection with the testimony at this

19   hearing with respect to the payment of $20,000 -- $20,940 if

20   you excuse me, in cash, there was no discussion of attorney's

21   fees at that point.  And yet --

22          THE COURT:  But that's where I get confused in this,

23   because if I remember from the original discussion, there was

24   supposedly a demand from I think was it via the brother-in-law

25   for the lower number, the 20,000.  They resolved it.  Then

1      there's the money paid back.

2            So this dollar amount is significantly higher.  It

3      actually reflects some, you know, meaningful number more for

4      counsel.

5            So why is it suspect because of the previous

6      interactions?

7            MR. BAUER:  Well, if it were just a matter of

8      including attorney's fees, because Mr. Kaller, you know, saw

9      the light and decided that he had an ethical obligation to

10     make sure that Mr. Aronauer got his fees, he would get -- he

11     would pay then 31,000 and some change, because you would have

12     to put attorney's fees on top of that.

13           THE COURT:  Well, I would -- all right.  Well, I

14     was --

15           MR. BAUER:  The fact that it went from --

16           THE COURT:  All right.  Why don't you finish and

17     then -- because I don't --

18           MR. BAUER:  Yeah.  It went from $20,000 and change

19     to $45,000.  That's not --

20           THE COURT:  Yeah, but there's been a --

21           MR. BAUER:  -- just for attorney's fees.

22           THE COURT:  There was a lot of discussion in this

23     case about, you know, with all due respect to defendant's

24     counsel, how his client, the client was frustrated that he had

25     to keep paying everybody here.  So for him, he doesn't care.

1  I would, you know, not him in particular, but a defendant

2  doesn't really care who gets the money.  He just wants the

3  case over with.

4          MR. BAUER:  No, that's the --

5          THE COURT:  That's the certain point.

6          MR. BAUER:  -- point, Your Honor.  He didn't care

7  who, you know, got the money.

8          THE COURT:  Right.

9          MR. BAUER:  He wasn't trying to ensure that Mr.

10  Aronauer got the money.  He was never given representations

11  from Mr. Santos.

12          THE COURT:  Yeah.

13          MR. BAUER:  With respect to it.  They cut a deal --

14          THE COURT:  So wait.  Just so I under -- are you

15  saying that these statements were never -- your thought is,

16  these statements are never made by Mr. -- where are you at

17  with this?

18          MR. BAUER:  Yes.

19          THE COURT:  You think the 45 -- you think the

20  $45,000 was paid, or wasn't paid?

21          MR. BAUER:  Well, we're going to have to accept

22  that, because --

23          THE COURT:  Okay.

24          MR. BAUER:  -- Mr. Santos, we understand, is --

25          THE COURT:  So then you think --

1           MR. BAUER:  -- in Mexico.

2           THE COURT:  You think that that was just for Santos?

3           MR. BAUER:  Yes, absolutely.  We think --

4           THE COURT:  And so this point that Mr. Kaller said,

5    that he confirmed it was his understanding that Mr. Santos was

6    going to give $16,000 to his lawyer, you think that's -- that

7    was never --

8           MR. BAUER:  We think he made that up.

9           THE COURT:  -- said by Santos.

10          MR. BAUER:  Exactly.  Or, in the alternative --

11          THE COURT:  And why would he pay Santos $45,000 for

12   something that is continuing theoretically?  I mean, we don't

13   know if it's actually going to continue, but --

14          MR. BAUER:  What?  Continuing because there was some

15   issue of attorney's fees?

16          THE COURT:  Uh-huh.

17          MR. BAUER:  He never contemplated that.  He thought

18   if he could --

19          THE COURT:  Even though we had -- I mean, we've

20   talked about this a lot about --

21          MR. BAUER:  Of course.  Of course.  And the history,

22   you know, the record with respect to these issues --

23          THE COURT:  Right.

24          MR. BAUER:  -- the prior go-around suggests that if

25   Mr. Kaller was really concerned about Mr. Aronauer and what he

1   might do on the heels of this little sort of private

2   settlement without lawyers being involved, he would have done

3   what any other client would do, which is say to his lawyer,

4   make sure you get this guy covered off because I don't want to

5   hear from him again.

6           THE COURT:  All right.  So different question then

7   is, what does it matter whether or not whatever it is that Mr.

8   Kaller thought?  He paid $45,000, which is, given the strength

9   of this case as it seemed to be shaping up, a decent amount of

10  money.

11          MR. BAUER:  Okay.

12          THE COURT:  And you get this Defendant's Exhibit 1,

13  Defendant's Exhibit 2.

14          MR. BAUER:  Uh-huh.

15          THE COURT:  The two letters.

16          MR. BAUER:  Right.

17          THE COURT:  So, it's done.  He paid $45,000.

18          MR. BAUER:  So --

19          THE COURT:  And the bottom line for this is, just

20  because -- the question is, is it Mr. Kaller's problem that

21  his client didn't pay the money to Mr. Aronauer?

22          MR. BAUER:  It is, because there was no global

23  settlement.  There's no settlement of claims.  There's no

24  release whatsoever.  There's no settlement of claims.  There's

25  an agreement to withdraw the case, which is different.

14

1          So there's nothing in writing that says and we're

2    waiving attorney's fees.

3          THE COURT:  But you don't really get -- I mean, I

4    know we do it through the dance of the release with FLSA labor

5    law cases.  What you really get is this notion that the back

6    wages have been paid, and/or under *Cheeks*, you know, it's a

7    reasonable compromise, if there is a compromise at all, of the

8    claims given the trial risk, given the facts of the case.

9          So, you know, that there's not a release, there's

10   been a satisfaction of the -- I mean, you know, theoretically

11   here.  There's a satisfaction of the claims.

12         And it really is not Mr. Kaller's problem that, you

13   know, Santos didn't carry through on what he, you know,

14   arguably should have done, which is pay his lawyer.  So you're

15   saying, so there's no release.  So there's the factual

16   question about what was intended, what was the meeting of the

17   minds.

18         MR. BAUER:  Right.  Was there a global settlement.

19   And the answer is, there wasn't.

20         THE COURT:  Yeah.

21         MR. BAUER:  There's nothing in writing that suggests

22   that there was, plainly.

23         THE COURT:  Except there's $45,000 that changed

24   hands on a case that wasn't that strong.  I mean, we've gone

25   through this, you know, so --

1          MR. BAUER:  Well, first of all, we've got to take

2     Mr. Kaller's word that it was $45,000.  We're sort of

3     conceding that for the purpose of discussion.

4          THE COURT:  All right.  But that was my first

5     question to you, so you can --

6          MR. BAUER:  Well, we -- the unrebutted record is

7     that there was $45,000 paid.

8          THE COURT:  Okay.

9          MR. BAUER:  We obviously don't know whether that's

10    the case.

11         THE COURT:  Right.

12         MR. BAUER:  It does seem sort of odd that that -- it

13    would end up with that number, but Kaller testified.  He said,

14    well, you know, I spent all this money in connection with the

15    hearing and I knew this was going to continue to be

16    expensive --

17         THE COURT:  Right.

18         MR. BAUER:  -- and so I increased the amount of

19    money that I was paying.

20         THE COURT:  Right.  But evidentiarily, do you think

21    that Mr. Kaller's testimony is enough to carry the day?  I

22    mean, it's definitely unrebutted because we don't -- we never

23    -- you know, we don't have Mr. Santos here, and nobody else

24    here as --

25         MR. BAUER:  If it were credible.

```
1                    THE COURT:  You know.

2                    MR. BAUER:  I would think there would be some

3       argument that --

4                    THE COURT:  So, if I were, if I were --

5                    MR. BAUER:  -- it supports the notion of a global

6       settlement.  The --

7                    THE COURT:  So if he's -- if it's credible, which --

8                    MR. BAUER:  If the testimony is credible, yeah.

9                    THE COURT:  -- I understand you're suggesting it's

10      not.

11                   MR. BAUER:  Right.

12                   THE COURT:  But that --

13                   MR. BAUER:  So the --

14                   THE COURT:  -- that Mr. Kaller is in a position to

15      provide -- let me say it differently.  His testimony about one

16      side of an agreement would be enough to carry the day on the

17      point about whether there was a $45,000 settlement if he were

18      -- if I were to find him credible.

19                   MR. BAUER:  Well, I would put it this way, Your

20      Honor.  Under New York Judiciary Law 475 and case authority,

21      the burden is on -- you know, well, let me say it in a

22      different way.  If there were a settlement that did not

23      include attorney's fees, a private, you know, settlement

24      involving the parties but not involving the attorney, that

25      didn't include attorney's fees, then there's still an action
```

1    for attorney's fees.  You know, there has to be a global

2    settlement agreed to in order to preclude that.  So, there's

3    nothing in writing that suggests that there was.  And his

4    testimony, if he's to be believed, seems to support the notion

5    that there is.  But his testimony isn't credible. As a result

6    -- as a result, there is no testimony, there's no evidence

7    whatsoever, no credible evidence that suggests that there was

8    a global settlement.

9            THE COURT:  Okay.

10           MR. BAUER:  And that's why Mr. Aronauer has a right

11   to his fees.

12           THE COURT:  Okay.  So who -- I mean, we're sort of

13   skipping ahead now.  Who would Mr. Aronauer be making the

14   application. On whose behalf?  Whose right is it to the fees?

15           MR. BAUER:  At this point he's got a right of his

16   own, is my --

17           THE COURT:  And you're saying that that --

18           MR. BAUER:  -- understanding of the judiciary law.

19           THE COURT:  You're saying for the labor law claims,

20   not the FLSA?

21           MR. BAUER:  Yeah, and Mr. Aronauer also directs me

22   to a case, and I don't think he's got a copy of it, forgive

23   us, it's *Feniwich v. Metropolitan*, 173 N.Y. 663.  It stands

24   for the proposition that a plaintiff's attorney can seek fees

25   in his own right under circumstances such as these.

18

1          THE COURT:  Meaning what?  Where someone --

2          MR. BAUER:  Where a --

3          THE COURT:  -- undermined it?

4          MR. BAUER:  Where a party settled and got money, but

5     there was no complete release.  There was no global

6     settlement, and there was no specific settlement with regard

7     to attorney's fees.

8          THE COURT:  Do you think there's a federal parallel,

9     like to that FLSA operates?

10          MR. BAUER:  Yeah, I don't think it's unique to the

11     FLSA.  I think it's, it's you know, it --

12          THE COURT:  Well, most federal statutes understand -

13     - you get fee shifting statutes, understanding is that it's

14     the plaintiff's --

15          MR. BAUER:  Oh, I see what you're saying.

16          THE COURT:  The plaintiff, not the plaintiff's

17     lawyer's right.  So, you know, sometimes there's sanctions,

18     sometimes there's, you know, circumstances that allow for the

19     plaintiff's lawyer to bring the claim.  And it's the, you

20     know, it goes into tax issues and the like.  You know, whose

21     right is it to get the money?

22          And it goes to, you know, how one would interpret

23     agreements when there's, you know, a fee shifting provision

24     versus a one-third -- you know, but so the, the right is with

25     the plaintiff, not the plaintiff's lawyer.  And so --

1          MR. BAUER:  That's not my understanding, Your Honor.

2     And forgive me, we don't have the case started for you here.

3     We'd love to be able to supplement it with a brief letter.  We

4     can get it to you by the end of the week.  Just with the few

5     cases.

6          THE COURT:  Okay.  What's the cite?  173?

7          MR. BAUER:  173 N.Y. 663, *Feniwich*, F-E-N-I-W-I-C-H.

8          THE COURT:  Is that New York?  New York Second?  New

9     York --

10         MR. BAUER:  It just -- New York.

11    (Counsel confers with client.)

12         MR. BAUER:  We believe it's 173 N.Y. 663.

13         THE COURT:  Okay.  Okay.  So you think we have --

14    all right.  The different permutations.  Do you think the

15    money changed hands?  I mean, you're saying Mr. Kaller isn't

16    credible, but we do have this, this Santos, whatever they are,

17    you know, sworn letters.  So --

18         MR. BAUER:  Yeah.  I mean, it seems fairly apparent

19    that money changed hands in connection with Mr. Santos in

20    signing these documents.  We don't allege that he was, you

21    know, buried in the desert somewhere and that these documents

22    were manufactured.

23         THE COURT:  Okay.  So $45,000 changed hands and the

24    question is, what's the scope of the agreement?

25         MR. BAUER:  We don't know the amount, but yes, we

20

1    think that the operative question is whether this was a global

2    settlement because if not, and we can get you the little bit

3    of authority, we thought it was sort of a general settled

4    proposition that in this instance we have a private

5    settlement, the attorney has a right to fees.  So we can get

6    you that authority.

7         But, you know, with that understanding then the

8    question becomes whether it was a global settlement.  There's

9    no documentation to support it.  Mr. Kaller's testimony would

10   tend to support it if it were to be believed.  But we think

11   it's just laughable.

12         THE COURT:  Uh-huh.  So you think then, what, Mr.

13   Aronauer should be able to make a fee application?

14         MR. BAUER:  Yes, Your Honor.

15         THE COURT:  What's your view on whether the 45,000

16   is fair and reasonable?

17         MR. BAUER:  Well, Your Honor in part because we're

18   not sure that --

19         THE COURT:  I mean, you said you didn't.

20         MR. BAUER:  -- that was the amount that was actually

21   paid.  We have to sort of take it on faith.  And in part

22   because we weren't involved in the settlement we'd like to

23   respectfully sort of bow out of that issue and take no

24   position.

25         THE COURT:  Uh-huh.  And then, is it your position

1    that Mr. Aronauer -- what's the relationship between him,

2    sorry, I know you're sitting right there, but you know,

3    between Mr. Aronauer and Mr. Santos at this point?  Is it a

4    continuing?

5              MR. BAUER:  What's the relationship?

6              THE COURT:  Is there some sort of continuing

7    attorney/client relationship?  Is it over?  Was it abandoned

8    with this letter?

9              MR. BAUER:  I --

10             THE COURT:  The sworn letter.

11             MR. BAUER:  -- think, Your Honor, that the --

12   effectively the representation sort of ends at that point

13   because -- and then there's no conflict to pursuing fees

14   because Mr. Santos is, from his perspective, the case is done

15   and he's out of the country.

16             THE COURT:  Yeah.  Is that what you think, he's out

17   of the country?  Do I have any account from --

18             MR. BAUER:  We believe that.  He's told Mr. Aronauer

19   more than once that that was his intention.

20             THE COURT:  Right.  But we don't know one way or

21   another?

22             MR. BAUER:  Oh, we don't, obviously.

23             THE COURT:  Nobody's seen him?

24             MR. BAUER:  As we said, he could be in the desert.

25             THE COURT:  All right.  All right.  So are there

22

1   other things in the record you think we should pay attention

2   to?

3               MR. BAUER:  I don't believe so, Your Honor.

4               THE COURT:  Okay.  To the flip side.

5               MR. KIRBY:  All right.

6               THE COURT:  Was there an agreement?  I mean --

7               MR. KIRBY:  Yes.  As plaintiff's counsel conceded,

8   there's unrebutted testimony, sworn testimony under oath from

9   Mr. Kaller and Mr. Zefarino.

10              People are forgetting about him, but Francisco

11  Zefarino corroborated everything Mr. Kaller said, that there

12  is a settlement agreement for $45,000.  $29,000 of it was ear-

13  marked for plaintiff's attorney's fees.  I'm sorry, $29,000 is

14  earmarked for the settlement.  The remaining 16 is earmarked

15  for plaintiff's attorney's fees.

16              That is all the evidence we have about the

17  settlement, other than the fact that these letters were sent

18  to plaintiff's counsel asking him to dismiss the case.

19              I know plaintiff's counsel would like to believe

20  that Mr. Kaller is not credible.  However, he is a very

21  credible witness.  The Court -- he's been testifying in front

22  of the court twice already.

23              The first time, the Court found him to be credible.

24  The second time, he did not say anything that would -- that

25  could be corroborated.

1          I mean, if he did that on cross-examination, he

2     testified that him and Francisco ran into plaintiff on the

3     street, which he lives a block away from the store, so that's

4     completely reasonable.

5          They discussed entering into settlement.

6     Plaintiff's counsel said, well, first I need to go talk to my

7     attorney.

8          The next day, they got together and plaintiff said,

9     I need at least $16,000 for my attorney, and 29 for myself,

10    which is how you get the $45,000 number, a number which is

11    more than double the previous settlement amount from just a

12    month before.

13         So it make sense that there is a portion of that

14    settlement that's being earmarked for attorney's fees.  Why

15    would Mr. Kaller more than double the settlement amount when

16    plaintiff was more than willing to take $20,000 the month

17    before?

18         Now, plaintiff's counsel raised an issue with the

19    fact that at least plaintiff represented to Mr. Kaller that

20    Mr. Aronauer was no longer seeking fees and just wanted him to

21    come to the office.

22              THE COURT:  Uh-huh.

23              MR. KIRBY:  Okay?  Mr. Kaller, he did say, you know,

24    in passing, hey, if you're not going to pay your attorney,

25    give me that $16,000 back.  That was the extent of the

24

1    discussion.

2         If you recall, the next part of the testimony is

3    they went out for dinner and Mr. -- Mr. Kaller never saw

4    plaintiff ever again.  So they never had the opportunity to

5    raise the issue of whether or not attorney's fees were paid

6    because plaintiff disappeared.

7         So given the unrebutted testimony by Mr. Kaller, the

8    testimony that was corroborated by Mr. Zefarino as to the

9    amount and the scope of the settlement, it's defendant's

10   position that this was a global settlement.

11        It was clearly a global settlement saying that to

12   pay plaintiff for his FLSA and New York Labor Law claims, and

13   to compensate plaintiff's counsel for his attorney's fees.

14        And now with respect to the amount of the attorney's

15   fees the $16,000 number didn't just come out of thin air,

16   right?  The objection -- plaintiff's bills up until the August

17   2017 when settlement is reached.

18             THE COURT:  Which is which?

19             MR. KIRBY:  Which is Plaintiff's Exhibit 1.

20             THE COURT:  Sorry?

21             MR. KIRBY:  Plaintiff's Exhibit 1.

22             THE COURT:  Okay.  Hold on.  Do I have it here?

23   Which is it?  Oh, yeah.  Okay.  All right.

24             MR. KIRBY:  So if you actually deduct all fees that

25   are incurred after August 3rd, 2017, because that was the date

25

1    of the settlement, plaintiff's fees equal $16,589.  $16,000.

2    So this number didn't just come up out of thin air by

3    plaintiff.

4         I know Mr. Aronauer has denied ever saying that

5    $16,000 is owed to him, but that was the number that was

6    relayed to plaintiff, that is the number plaintiff relayed to

7    my client, and that is the amount that was paid to plaintiff

8    to give to his attorney.

9         THE COURT:  Well, how do you go from 20 to 29 for

10   the client?  Right?  Or whatever the 20 was supposed to be

11   for, but that was the number, I think it was the brother-in-

12   law, right, who --

13        MR. KIRBY:  Yeah, so the --

14        THE COURT:  Maybe I'm getting the -- yeah.  Yeah.

15        MR. KIRBY:  -- 29, that -- and I don't think Mr.

16   Kaller has testified as to how they got to that number, but

17   obviously plaintiff returned the $20,000 before.  So you know,

18   that was not enough for him to resolve the case, and maybe the

19   extra $9,000 was.  I'm speculating here.  Mr. Kaller did not

20   testify as to how the 29 was reached.

21        THE COURT:  Well, the suggestion was made by

22   plaintiff's counsel that some of these numbers are just

23   unreasonable, which makes it not credible.  So, I mean --

24        MR. KIRBY:  Unreasonable as --

25        THE COURT:  -- 29 -- how do you go from 20 to 29, to

1    add the 16?  So yes, there's no basis in the record to explain

2    how you go from 20 to 29.  Right?

3         MR. KIRBY:  Well, it was obviously an ongoing

4    settlement discussion. So it makes more sense for a settlement

5    amount to jump $9,000. And rather than $25,000, if you're not

6    including attorney's fees. So I know Mr. Kaller has not

7    testified as to how the 29,000 number was reached at.

8         But I think that's within the range of what they

9    were discussing, the initial settlement talks in this case

10   between Mr. Kaller and plaintiff for around the 10,000 range.

11   Went up to 20, ultimately --

12        THE COURT:  Well, that was your client's offer.

13   Then there was the family response and then that money was

14   returned, and then --

15        MR. KIRBY:  Correct.  So it --

16        THE COURT:  -- apparently this picks up again.

17        MR. KIRBY:  -- it kept going up in $10,000

18   increments, you know?  So I think the $29,000 is well within

19   the realm of reasonableness, particularly since both Mr.

20   Kaller and Mr. Zefarino testified that was the agreement that

21   was reached.  Twenty-nine for attorney's fees -- sorry, 29 for

22   the claims and 16 for attorney's fees.

23        THE COURT:  All right.

24        MR. KIRBY:  So it is our position that this is a

25   global settlement.  There are no -- an attorney's application

1      does not need to be made.  Plaintiffs, if he's going to --

2                THE COURT:  What about -- I'm sorry.

3                MR. KIRBY:  Sorry.  If he's going to seek attorney's

4      fees, he can seek it from his client.  It's already been paid

5      to him.

6                THE COURT:  Well, that's obviously one answer here,

7      but plaintiff's response would be, or is that there's no paper

8      releasing the claims and because this would be -- presumably

9      there were FLSA and New York Labor Law claims on the table,

10     the New York Labor Law, at least, possibly the federal law as

11     well, would either assume that it was not a global settlement

12     or that plaintiff's counsel's claim is still, you know, in

13     quotes, "alive" against the defendant.  Not I mean --

14               MR. KIRBY:  Yes, I'm aware of the --

15               THE COURT:  Put aside the --

16               MR. KIRBY:  -- the case law that they're referring

17     to.  But, you know, my general understanding is if it's a

18     global settlement that's inclusive of attorney's fees, then

19     there is no remaining claim against the defendant.  It's

20     defendant has, you know, made his payment obligations.

21               THE COURT:  Well, assume for the moment, just for

22     the argument, that they find that this question, whether it

23     was global, just can't be resolved.  So it seems to be an

24     agreement that money and you're both willing, it seems $45,000

25     changed hands between the principals here.

1         But if it's not a global settlement, or there's not

2    enough evidence to show it's a global settlement, then where

3    does that leave your client with regard to the possibility of

4    plaintiff's lawyer having a direct claim against the

5    defendant?

6         MR. KIRBY:  Again, I'm not familiar with the case

7    law that they're referring to.  But I don't believe how that

8    could be equitable if my client has paid an amount of money to

9    plaintiff, earmarking a portion of that for attorney's fees,

10   how my client could be on the hook for additional attorney's

11   fees beyond that.

12        THE COURT:  Because he didn't make sure that -- you

13   know, I mean, he could have written two checks.  He could have

14   walked in with, you know, 15, $16,000, you know, delivered it

15   however he wanted to deliver it to plaintiff's counsel.  So

16   the risk -- I mean, that one argument is the risk falls with

17   him.  So, that's just the argument.

18        The 475, does that just take -- looking while you're

19   talking.  Doesn't a lot of this come up in the context of a

20   lien and whether somebody undermines a lien?

21        MR. BAUER:  I don't --

22        THE COURT:  It's about charging liens, retaining

23   liens, et cetera.

24        MR. BAUER:  I don't think it's exclusive to that,

25   Your Honor.

1          MR. KIRBY:  And my understanding of the lien law,

2      that's where you really focus on the -- whether or not it's a

3      global settlement.

4          THE COURT:  All right.  So we're not, in terms of

5      the law, neither of you seems to be complete sure about which

6      way this would go under state law, under federal law.  All

7      right.  What about this question -- I have a couple of

8      questions.

9          First, is it a fair and reasonable settlement?  I

10     mean, there have been several conferences about this.

11         MR. KIRBY:  Yes.

12         THE COURT:  There is a lot of -- I mean, the large

13     back and forth was plaintiff claimed he had a lot of unpaid

14     hours, and defendants would be that plaintiff was not a

15     particularly good employee because he had a lot of issues and

16     he no way/no how, did the kind of work that he says he did.

17     And nobody's paperwork is great.  There's a lot of paperwork.

18     Some indicia that's it real, some, you know, there's the

19     suggestion that it's not.  You know, the forms -- this is

20     really looking at Defendant's Exhibit 5.

21         MR. KIRBY:  Right.

22         THE COURT:  The forms change over time, but the

23     handwriting is similar.  You know, whatever.  You can go back

24     and forth on this point, so that just goes to this, you know,

25     how strong is the claim?

30

1              MR. KIRBY:  Yes.

2              THE COURT:  Because they don't suggest --

3              MR. KIRBY:  I'm sorry, Your Honor.

4              THE COURT:  There is the plaintiff -- it would have

5     been plaintiff's testimony in light of defendant's records,

6     and it would have been a back and forth, and then you know,

7     this area of the law is a little up in the air.

8              You'd have to go back and look at the timing, but

9     you know, he might get the five or $10,000 because you don't

10    have the right paperwork for the wage statements, et cetera,

11    under the labor law.  So.

12             MR. KIRBY:  Yeah, so we think the $29,000 that was

13    earmarked for the settlement of his wage claims is more than

14    reasonable and fair under *Cheeks*.  So, you know, first of all,

15    our initial position is that plaintiff owed zero, you know,

16    our records --

17             THE COURT:  No, that's --

18             MR. KIRBY:  Yeah.

19             THE COURT:  I mean, that's my point.

20             MR. KIRBY:  So our records reflect that --

21             THE COURT:  This is --

22             MR. KIRBY:  -- he worked --

23             THE COURT:  -- a lot of money.

24             MR. KIRBY:  -- and was paid everything he was owed.

25             THE COURT:  Right.  And so, a lot of -- you know, so

1    obviously plaintiff was trying to make out a stronger claim

2    that he hadn't been paid, that he was a good worker, and I

3    think, you know, whatever the quality of what he actually did,

4    that he showed up on time, he didn't miss days of work, et

5    cetera, and obviously at different points defendants were

6    saying otherwise.

7             MR. KIRBY:  Yeah, and we run a -- ran a few damages

8    analysis based on our records and plaintiff's testimony for

9    the DOL.  You know, plaintiff testified at the DOL, he only

10   worked two hours of overtime each week.  Right?  But our

11   records show he worked 6.5 hours of overtime.

12            Our records also show he was paid, it changed over

13   time, but roughly $400 per week, and our point of view is that

14   is an all-inclusive payment.  It includes both regular and

15   overtime wages.  So --

16            THE COURT:  At what hourly rate?

17            MR. KIRBY:  At a rate of -- changed over time.  I

18   believe it was -- give me one second.

19        (Pause.)

20            MR. KIRBY:  The hourly rate was roughly $8.68 per

21   hour.  So if you're doing a calculation based -- assuming that

22   he did not get paid for all hours worked, the way to calculate

23   overtime payments here would be at half time, half the regular

24   rate because he was paid $400 for the 46 he worked.

25            THE COURT:  You say 400.  What, 400 was for the --

1          MR. KIRBY:  For the 46.5 hours worked.

2          THE COURT:  Okay.

3          MR. KIRBY:  So, if you're assuming, which we think

4     is a large stretch, if you're assuming that those 6.5 hours of

5     overtime were not paid, you still have to give credit for the

6     regular time that was paid for those 6.5 hours.  So the

7     overtime --

8          THE COURT:  Okay, well --

9          MR. KIRBY:  -- calculation is, it's half-time

10    calculation.  It's not time and a half.

11         THE COURT:  Well, there is the other --

12         MR. KIRBY:  So, we did both half time and time and a

13    half.

14         THE COURT:  Sometimes there is --

15         MR. KIRBY:  We ran both.

16         THE COURT:  Okay.  So what's the -- so --

17         MR. KIRBY:  So the half time calculation came out to

18    a total of, based on our records $4,264.14.

19         THE COURT:  Say that number again?  Four thousand --

20         MR. KIRBY:  Four thousand.

21         THE COURT:  Uh-huh.

22         MR. KIRBY:  $264.14.  We did not include in this

23    calculation the three years of time that was covered by the NY

24    DOL audit.  He already issued payment from DOL for that.

25         THE COURT:  Uh-huh.

1          MR. KIRBY:  So the time period, not including that

2     DOL audit, using a half time, over time calculation we came up

3     to $4,264.14.

4          THE COURT:  And time and a half?

5          MR. KIRBY:  And time and a half, running the same

6     calculation, we came up with a rate of --

7          THE COURT:  About --

8          MR. KIRBY:  -- $14,871.19.  So either way --

9          THE COURT:  By deducting the DOL?

10          MR. KIRBY:  Deducting the DOL, correct.

11          So either way, it's well below the $29,000 he

12     received, settlement.

13          THE COURT:  What about the paperwork claim?

14          MR. KIRBY:  So if you add on the paperwork claim,

15     you're up to $10,000. So adding 10,000 the 4,000 number gets

16     you 14.  And then 10,000 of the other 14,000 gets you 24.  So

17     either way, you're still -- he received more than he could

18     have recovered.

19          THE COURT:  Okay.  And those calculations are based

20     on Defendant's Exhibit 5?

21          MR. KIRBY:  Correct.  Defense Exhibit 5.

22          THE COURT:  Okay.  All right.  So your view would be

23     it's --

24          MR. KIRBY:  It's fair to plaintiff, it's reasonable

25     under *Cheeks*.

1              THE COURT:  And that the fees were about what the

2      fees were at the time.

3              MR. KIRBY:  Correct.  The 16,000 in fees is actually

4      corroborated by plaintiff's own attorney's fee records.

5              THE COURT:  All right.  What about the bigger

6      picture policy points?  And this is really for both of you,

7      and how I should be looking at this.

8              So, starting with the defendant's side.  One view is

9      -- which obviously came up in the previous hearings, the

10     principal -- I'm calling Mr. Santos principal -- they're

11     completely free to talk to each other.  Right?

12             So you really, you know, the lawyers are here to

13     help, and obviously you can't -- you're not allowed to do

14     without everybody's agreement is go from, you know, lawyer to

15     principal.  Or, you know, from either side.

16             But you know, they're free to negotiate, and it's

17     not really -- these are the arguments, right?  It's not really

18     the Court's place to tell them they can't talk because, you

19     know, I think you essentially have a gag order, which, you

20     know, that would be beyond, I think, the Court's power and you

21     know, not reasonable and not the way the world works in the

22     kinds of cases that come up.

23             So, you know, people negotiate, obviously, and in

24     the FLSA New York Labor Law context there is a concern, and

25     this somewhat -- this is articulated in *Cheeks* and some of the

1        cases, you know, that are its progeny.  There is a concern

2        about overbearing employers or former employers and, you know,

3        the relative power that they wield either because somebody is

4        continuing employment, or you know, some of the issues that

5        were explored in that previous hearing were maybe their

6        standing in the community relative to the employee.  So

7        there's a concern, but the underlying principle is still

8        there.

9              And obviously, the statutes have relatively recently

10       been beefed up to strengthen the retaliation provisions.  So

11       if that's employee, then the plaintiff would have some other

12       relief.

13             So really, one view is, they're free to talk to each

14       other.  They're free to resolve their case.  Obviously, it

15       would be in their interest to have some better paperwork.

16             But you know, people are free to have oral

17       agreements or this, whatever this letter -- you know, which is

18       not what a lawyer would draft but makes the point, like this

19       is over, I'm not pursuing you anymore, I got enough money,

20       we're done.  And it's really totally up to the plaintiff,

21       should have paid his lawyer.  He's, you know, had whatever

22       agreement he had, and that's it.

23             The other view is this is essentially something like

24       interference with a contract.  You know that counsel has a

25       retainer agreement, both from the previous discussions and

1    because it's required, and given the nature of the case, et

2    cetera.  Like the dollar amounts involved.

3             So, really, the only point to Mr. Kaller having this

4    conversation here was, you know, to chip away at what he might

5    have had to pay, and that obviously includes plaintiff's

6    counsel.

7             And obviously the -- Mr. Kaller testified, he was

8    sensitive to the fact that the money he was paying was ticking

9    up on both sides of this case.

10            So, you know, if you allow without some formal

11   requirement, this kind of discussion to happen, and you have

12   a, unscrupulous might be too strong a word, but a self-serving

13   plaintiff, the lawyers will never get paid, and that

14   completely undermines the private attorney's general

15   situation, which is you know, how this fee shifting is set up.

16            So, you know, plus, you know, the way this

17   originally all percolated up was this, you know, concern about

18   *Cheeks*.  So if the clients settle directly, and there's no

19   paperwork, or there's minimal paperwork -- so looking at one

20   and two, you know, *Cheeks* is undermined, the Court ends up

21   having these kinds of discussions, and what do we do with this

22   whole situation?  It's a mess.  I mean it's, you know, this

23   not ideal and should it be allowed to go on, you know,

24   especially in light of *Cheeks*.

25            So -- and then there's the additional piece, which

1    doesn't seem like you all have the law, but you know, what's

2    the deal with the 475 and/or parallel principles, which would

3    just say we, as much as we agree that Mr. -- seem to agree

4    that Mr. Santos got his money, we agree Mr. Aronauer didn't

5    get his.  And so, you know, does -- policy aside, isn't the

6    law already recognizing that issue?

7           And you know, tension on both sides.  Right?  How

8    would it facilitate, or how to let these cases run their

9    course and the parties come to an agreement versus, you know,

10   essentially there are three or four parties in any represented

11   case.  Right?  I say three because sometimes the plaintiff

12   doesn't have a lawyer, sometimes the defendant doesn't have a

13   lawyer, but here we had you know, four.

14          So thoughts about how it should get sorted out with

15   the either FLSA, or *Cheeks*, or the judiciary law would say

16   about any of these issues.

17          MR. KIRBY:  Well, as -- you know, as I previously

18   said, our position is that this was a global settlement.

19          THE COURT:  Okay.  But just --

20          MR. KIRBY:  So, so --

21          THE COURT:  -- take into account --

22          MR. KIRBY:  Yeah.

23          THE COURT:  -- what the plaintiff's argument is, is

24   well, that's nice, but you, you know --

25          MR. KIRBY:  Well --

1              THE COURT:  -- the money never went to --

2              MR. KIRBY:  The way I heard plaintiff's argument

3     was, if this is a global settlement then there is this whole

4     issue of whether or not the fees would come from defendant is

5     out of play.  A global settlement means that the amounts were

6     fully paid and that plaintiff's remedy -- plaintiff's

7     counsel's remedy is against his client.

8              THE COURT:  Okay.  So it's -- what if it's unclear?

9              MR. KIRBY:  Well, if it's unclear then I guess we

10    would -- we fall back on an equitable argument.  You know, the

11    only -- I know the documentation is not great, right, but it

12    was not something that was drafted by a lawyer, because the

13    two individuals preparing some sort of documentation to --

14             THE COURT:  Some teenager translating, apparently.

15             MR. KIRBY:  -- dismiss the case.  Exactly.  So I

16    agree, it's not perfect.  But that's why you call it an

17    evidentiary hearing, to determine what was paid and how it was

18    determined.  And the testimony at that hearing was, this

19    $45,000 settlement and is broken up a certain way to account

20    for plaintiff's attorney's fees.  There's been no evidence to

21    rebut that.

22             THE COURT:  So if there is no -- if it's unclear

23    whether it's global, do you agree that -- so then your

24    argument is, look, why would we essentially -- $45,000 in

25    light of a case where we think the plaintiff had no claim, or

1    a very, very minimal claim given especially the DOL had -- you

2    know, he'd already been dealing with DOL is -- it's completely

3    unreasonable to think you'd pay $45,000.

4              MR. KIRBY:  And that's not inclusive of attorney's

5    fees.

6              THE COURT:  All right.  And then your review on the

7    next permutation, which would be no equity.  You do know

8    there's $45,000.

9              Does plaintiff's counsel have his own claim,

10   particular -- whichever way that goes, given that his client

11   seems to be completely out of the picture.  Is it a claim

12   owned by the plaintiff or by the plaintiff's counsel?  Or can

13   plaintiff's counsel, without the authority of his client,

14   except that whatever the retainer agreement would say on this,

15   which I don't know if it says anything, be allowed to litigate

16   a claim in his own name against the defendant?

17             MR. KIRBY:  As I said before, I'm not familiar with

18   the case law that they're citing, but I don't see how that

19   could be the case, how plaintiff's counsel could  step on the

20   shoes of his client to pursue statutory attorney's fees that

21   are owed to the plaintiff.

22             THE COURT:  Well, I think the argument is -- that's

23   why I asked, is whether the FLSA is different from the labor

24   law, because -- or whether 475, which is what, plaintiff's

25   counsel, I think you're relying on, that 475, you know, how

1      that works with the labor law,  if it has any effect on the

2      FLSA.

3              All right.  And then on the plaintiff's counsel's

4      side, your view is, there is no -- you're really not

5      particularly interested in really disputing that -- whether

6      there's $45,000 that changed hands, you think some money

7      changed hands, it's unrefuted that that was the dollar amount,

8      but that the point that there was a discussion about fees is

9      Mr. Kaller's gloss, and it's not credible, so the agreement is

10     not a global settlement.

11             So if it's not a global settlement, then you think

12     that what, the -- we then, what, the default position is,

13     attorney's fees were not resolved?  Or that 475 gives you just

14     an independent way to get the money?

15             MR. BAUER:  No, Your Honor.

16             THE COURT:  Where do you go?

17             MR. BAUER:  No.  We would concede if the Court makes

18     a determination that there was a global settlement.  Then

19     that's Mr. Aronauer's problem that his client walked away with

20     his money.  We submit that --

21             THE COURT:  Okay.

22             MR. BAUER:  -- it is absolutely incredible to

23     believe the testimony of Mr. Kaller, and therefore there was

24     no support for the proposition that there was a global

25     settlement, and therefore, Mr. Aronauer has a right to a

1    claim.  And we, and again, forgive me, we should have had, you

2    know --

3              THE COURT:  Okay.  All right.  Well, you can --

4              MR. BAUER:  -- it all squared away, but I'd like to

5    get you that authority and we can do it this week.

6              THE COURT:  So you both can do that.  Okay.

7              So you're -- you think that the state law and

8    possibly some view of federal law gives you, your client --

9    your client, Mr. Aronauer, an independent right to bring the

10   claim against defendants, whether or not his client is in the

11   picture, which he seems not to be.

12             MR. BAUER:  Right.  We don't think that's the

13   dispositive issue.

14             THE COURT:  It's just -- it's the lawyer's right.

15             MR. BAUER:  Whether it was a global settlement.

16             THE COURT:  That raises what the lawyer -- okay.

17             MR. BAUER:  Yeah.

18             THE COURT:  And then --

19             MR. BAUER:  If those claims are not extinguished,

20   then they're alive.

21             THE COURT:  Okay.  Well, but just to make sure I'm

22   clear, it doesn't matter whether the client is in the picture

23   anymore.  It's just an independent right that the counsel has

24   against the defendant?

25             MR. BAUER:  Well, I would believe, yes, with the

42

1      understanding that if Mr. Aronauer were to locate Mr. Santos

2      and get that money from him, then obviously he doesn't have a

3      claim anymore.  And --

4                  THE COURT:  But that would be sort of an offset,

5      right?

6                  MR. BAUER:  Right.  That's what I'm saying that --

7                  THE COURT:  It would be satisfied somehow.

8                  MR. BAUER:  Just to -- yes.  You know, I'm saying

9      that, you know, he's going to write it against his client and

10     then he'd have to, you know if it were ever possible he'd have

11     to go against him in the first instance --

12                 THE COURT:  Right.

13                 MR. BAUER:  -- and then this becomes something of an

14     indemnification issue.  But, you know, as long as these claims

15     are not extinguished by global settlement, our position is

16     that he's got a right, and we'll get you that authority.

17                 THE COURT:  Okay.  So I know you keep trying to bow

18     off it, but whether it's a -- so the question that is the

19     *Cheeks* question, which is whether it's fair and reasonable.

20                 To me it seems like if not the mirror, a very close

21     question to this point about whether the amount of money

22     suggests that it was meant to settle the attorney's fees.

23                 So, taking -- you know, what's the counterpoint to

24     defendant's counsel who would say, besides the fact that, you

25     know, Mr. Kaller is sticking to the point that we owe you, Mr.

1      Santos, either nothing or almost nothing, but he wants the

2      litigation to go away, that he got full satisfaction of his

3      best possible claim, which is the time and half with the DOL

4      amount credited.

5              And he got the $10,000 that's, you know, arguably

6      here for the paperwork claims.  Arguably, I just, I didn't go

7      back and look at the exact dates of employment in line with

8      that statute, but just for the sake of this conversation say

9      he would get the $10,000.

10             So that's 25.  He got 29.  Your client's claim was

11     something like 16.5.  I think, you know, I mean there was the

12     hearing which wasn't successful.  So I don't know.

13             Like there's a lot of -- so it was reasonable to

14     take it at the time of the settlement, arguably.  That would

15     be the position.

16             So I know you don't want to weigh in on it, but

17     doesn't it go to the credibility?  Because your argument is

18     that some of these statements are -- not sure your word,

19     incredible, fantastical, whatever word you used.

20             You know, basically, really, you bumped into the guy

21     on the street and you resolved your case?  Like that doesn't

22     make any sense.

23             Their view is, yeah, because they're a block away

24     from each other.  They're in the neighborhood.  That's how we

25     ended up with that whole thing about, you know, he was working

1    on the corner and the claim that the -- Mr. Kaller took his

2    picture.  Right?  They're all in the same neighborhood.  They

3    know each other.  They know the family members, et cetera, et

4    cetera.

5          So do you think -- what's your view on the amount?

6    Or you think it has nothing to do with thinking about how this

7    is credible or not credible as to what this was --

8          MR. BAUER:  So my view with respect to the amount,

9    Your Honor -- you're not asking whether we think it's fair,

10   are you?  Or are you asking that as well?

11         THE COURT:  I mean, I think if one were to say a

12   client got all his money, that suggests that it's fair.  But

13   I'm asking --

14         MR. BAUER:  What that amount reflects in terms of --

15         THE COURT:  -- given the strength or lack of

16   strength of Mr. Santos's claims doesn't the -- does or doesn't

17   the arithmetic aspect of this either suggest or not suggest,

18   you know, whichever way you're going on it, that the $45,000

19   was a global settlement?

20         Because if you take, you know, the different pieces

21   here, Mr. Santos -- so you have the calculations that

22   defendant's counsel offered, which the best possible number

23   for Mr. Santos if you believed the numbers that Mr. Santos was

24   claiming he wasn't paid for, he would get about just under

25   $15,000 after you've taken out money he already got from a DOL

1    settlement.

2           And $10,000 for the paperwork errors, and you know,

3    whether those paperwork claims are good or not, I mean, you

4    know, maybe they're good given, looking at that paperwork.  I

5    don't know.  When I say that paperwork, I mean Defendant's

6    Exhibit 5.

7           So he got 25 -- I mean, he only at best had a claim

8    for $25,000.  He got $29,000 and it's not beyond the realm

9    that he had $16,000 as the number from his attorney, given

10   that his attorney's time sheets support that the attorney's

11   amount of claimed fees was $16,500 about -- at about the time

12   of the settlement.  I mean, it's not, you know, it's not a

13   totally random number.  If you put those two together and you

14   know, Mr. Santos had full and fair satisfaction, and you know

15   -- so.

16          But if your claim, you know, if you were to say, no,

17   you know, we looked at these time sheets and applying the

18   appropriate rules, you know, his claim was a $50,000 claim,

19   and well then, if he had a $50,000 claim then, you know, maybe

20   the settlement should have been $66,000 and that would suggest

21   this was not a global settlement.

22          Let me just ask.

23          MR. BAUER:  Oh, I see.  I see.

24          THE COURT:  I'm sorry.  One -- the defendant's

25   position, that would be just giving him -- is that including

1     liquidated damages?

2              MR. KIRBY:  That is not including liquidated damage.

3              THE COURT:  It's claiming -- so it's giving him what

4     he says he wasn't paid.

5              MR. KIRBY:  Correct.

6              THE COURT:  Which, given sort of a split the baby

7     approach here, given the -- you know, it's plaintiff's

8     testimony.  But we know from the previous hearing, that there

9     would definitely be testimony offered by other -- Mr. Kaller

10    and others at the store, suggesting that Mr. Santos was not

11    telling the truth, so we'd have a he said/he said/she said

12    situation, and whether, you know, I've only seen the copies, I

13    haven't heard the testimony about it, but that there are time

14    sheets.

15             So, for example, an important question would be

16    whether there would be a shifting of -- you know, plaintiff

17    would go into it with some kind of rebuttal, with a

18    presumption that could be rebutted.

19             Or, given that there are fairly extensive time

20    sheets, that it would just proceed as a, you know, normal case

21    where there's no presumption for the plaintiff.

22             And there's all those considerations that would go

23    into how one looks at this dollar amount.  I mean, this is

24    sort of very fundamental.

25             Why, you know -- why did Mr. Kaller pay $45,000, and

1   why was that a satisfactory amount to the plaintiff?  And you

2   can imagine different narratives, and we're definitely

3   imagining here, right?  He got all his money, he's fine with

4   it.  Mr. Kaller was okay with paying him that amount of money.

5           I mean, we reasonably know from Mr. Kaller that he's

6   attorney -fee sensitive.  He's said it.  So, anyway, as much

7   as you very early on --

8           MR. BAUER:  Right.  Right.

9           THE COURT:  -- in this, today's argument said, we

10  don't want to weigh in on fair and reasonable, to me that sits

11  right next to the question of --

12          MR. BAUER:  I think I'm following you.

13          THE COURT:  -- is the amount credible?

14          MR. BAUER:  I think I'm following you.  And I'll

15  allow Mr. Aronauer to correct me if that's okay --

16          THE COURT:  Sure.

17          MR. BAUER:  -- if I'm wrong.

18          THE COURT:  Yeah, sure.

19          MR. BAUER:  But my belief is ultimately, if 45,000

20  were presented to us, that -- that you know, that number might

21  have worked, which is why it's confusing that you know,

22  they --

23          THE COURT:  Globally it might have worked or just

24  for Mr. Santos?

25          MR. BAUER:  No, globally it might have worked.  We

1      were north of that in terms of where we were.  We never really

2      got to the question because it wasn't posed to us of

3      whether we would, you know, authorize, including attorney's

4      fees, a settlement of $45.  But it's not out of the realm.

5             But to the extent this bears on the question of Mr.

6      Kaller's credibility in terms of, you know, that number, we

7      think it doesn't at all.

8             I mean, first, you've got to take it on faith that

9      that's the number.  I mean, we said look, we've got to accept

10     because there's no other testimony that that 45,000 is what

11     was paid.

12            It is sort of convenient that -- and you look at it,

13     as we said before, you've got a deal, you get $21,000, just

14     shy of that, given to him in cash.  He gives it back.  He

15     comes back and he says, you know, basically, I apologize for

16     giving the money back.  I want to do the deal, I just want to

17     get my lawyer involved.

18            And, you know, despite the fact that that's the

19     number that was the only number in mind, there's no discussion

20     about any other number, Mr. Kaller then brings, hey, I'm going

21     to bring $50,000 just in case he wants to more than double his

22     demand.  You know, that doesn't hang together at all.  The --

23            THE COURT:  Except that Mr. Kaller seemed to be

24     previous that I was walking around with 10 and $20,000, you

25     know, in cash, right?

1          MR. BAUER:  Well, I mean, some people carry that

2     kind of cash.  He, you know, it's pretty plain he had -- I

3     think he said he had a briefcase, and you know, 50 or --

4          THE COURT:  Right.

5          MR. BAUER:  $50,000, that's not -- he happened to be

6     walking with that around.  He gave testimony with respect to

7     it.  He's like, oh well, I you know, that's sort of -- I

8     anticipated that it was going to be more because we were sort

9     of more deeply into it --

10         THE COURT:  Right.

11         MR. BAUER:  -- without any discussion whatsoever.

12    And so you've got a guy, Santos, I apologize, I want you to

13    forgive me, he said, I want you to forgive me for giving the

14    money back.  Then the anticipation is, okay, when he comes

15    back he's going to ask for more than twice the amount.

16         And part of it is because it's going to be for

17    attorney's fees, despite the fact that we're doing this whole

18    thing directly because I think we're going to get a better

19    deal, in part because maybe we're not going to deal with the

20    lawyer.  I mean, I think that's how this all lines up.

21         In terms of whether $16,000 to -- you know, for the

22    purpose of Mr. Aronauer is -- you know, a, you know, a

23    remarkable coincidence as it relates to the actual expended

24    attorney's fees at the time, we would think, yeah, you know,

25    that's --

50

1              THE COURT:  Did your client ever communicate that

2     number to --

3              MR. BAUER:  To his client?

4              THE COURT:  -- his client?

5              MR. BAUER:  I don't believe so.  Do you want to

6     speak to that?  Did you ever tell Santos where we were in

7     terms of attorney fees?

8              MR. ARONAUER:  I don't believe -- I think I

9     testified to this, Your Honor. I don't believe I ever had that

10    discussion with Santos.  It's possible that I could have

11    related it to defendant's counsel in terms of a negotiation.

12             MR. BAUER:  I was just going to say, that's where

13    they got the information.

14             MR. ARONAUER:  That's probably where they found it.

15             MR. BAUER:  Kaller knew the fees were 16,000 because

16    -- you know, and this is --

17             THE COURT:  That's what I thought.

18             MR. BAUER:  -- speculation.  We're not going to, you

19    know, get into accusing anybody.  But Mr. Aronauer had made

20    Mr. Raffin aware of the expended attorney's fees in connection

21    with a lawyer to lawyer negotiations.

22             And so the fact that Mr. Kaller testifies, oh, he

23    wanted $16,000 for his lawyer, well, that coincides with the

24    information that he would have irrespective of Santos.

25             So you know, you get Santos, not a particularly

1    sophisticated guy supposedly -- I mean, this is the whole

2    thing.  I mean, did he really -- you know, the question is,

3    did he really communication with Jacob Aronauer with respect

4    to this issue?

5              THE COURT:  Right.  The difficulty --

6              MR. BAUER:  You know Mr. Aronauer didn't have that

7    conversation with Mr. Santos.

8              THE COURT:  Right.

9              MR. BAUER:  Then the question becomes, well, is

10   Santos savvy enough to have made up that number?  And you

11   know, sort of put this over on Mr. Kaller so he could get

12   another $16,000 in settlement, yet end up with $45,000 and

13   then potentially not give it to Mr. Aronauer?  That doesn't

14   track.

15             This is a guy who, you know, according to Mr.

16   Kaller, was fearful that his family was going to be deported,

17   that Mr. Aronauer was going to take action against him if he

18   didn't give the money back.  We didn't tell Mr. Aronauer,

19   look, I got this money from these guys.  And yet, that's

20   supposedly the guy who, you know, came up with this issue of

21   $16,000, where he got it and why, makes up a story about, you

22   know, Mr. Aronauer, and then makes up another story about the

23   subsequent call.

24             And then you've got the -- Mr. Aronauer is telling

25   me, I don't have to give him any money.  You know that didn't

1  happen, Your Honor.  You know that Jacob Aronauer did not call

2  Mr. Santos and say, you know, while they were meeting and say,

3  hey, you know what?  Just come to my office.  You just need to

4  meet with me.  You don't need to give me any money.

5          So we know that's false, and Kaller testified to

6  it --

7          THE COURT:  Well, but this has been the testimony --

8          MR. BAUER:  -- so there's two possibilities.

9          THE COURT:  This is what the testimony says at 45,

10  page 45.

11          MR. BAUER:  Uh-huh.

12          THE COURT:  All right.  This is -- he told me he

13  visited his attorney, or had spoken to his attorney, and that

14  he told him his desire to drop the case and he wants to go

15  back to Mexico.  And he told me that his attorney told him

16  that I am out $16,000 in this case.  Give me $16,000 and do

17  whatever you want.

18          And he asked for the money, and he gave me the money

19  I wanted.

20          MR. BAUER:  Right.  And we know that conversation

21  between Mr. Aronauer and Mr. Santos never took place.  Mr.

22  Aronauer has given testimony, that didn't happen.  They didn't

23  have that discussion.

24          Mr. -- you know, he says supposedly he said he came

25  that day, and then there were subsequent discussions, and he

1   had the money, and the people in the office said, don't worry

2   about it.

3            THE COURT:  Did the conversation -- and, you know, I

4   don't think asking her about the fees was asking you any

5   attorney/client.

6            Now you're in the sort of more vague land, given

7   that there were settlement discussions between plaintiff and

8   Defendant's counsel, plaintiff's counsel and defendant's

9   counsel, did his client know what the settlement posture was,

10  right?  Because it would either probably be a third or fees.

11           So it's not beyond the realm that the $16,000 came

12  up in that conversation.  But like that's not the, you know,

13  testimony.  But since we have counsel here, I don't know how

14  you think about that question.

15           MR. BAUER:  I don't think it's a problem for them to

16  address that issue.

17           THE COURT:  Okay.

18           MR. BAUER:  Whether they discuss fees, I don't think

19  that's, you know --

20           THE COURT:  Yeah, I don't think it is, but you know,

21  I don't want to tell anybody their --

22           MR. KIRBY:  If I may real quick?

23           I know there was some speculation that Mr. Kaller

24  received the attorney's fees amount from his attorneys.

25  Obviously, there's no testimony to support that.  The

54

1    testimony is that the attorney's fees amount was relayed to

2    him by Santos.

3                THE COURT:  Right.

4                MR. KIRBY:  So the speculation aside, you know,

5    that's where the attorney's fees amount came from based on the

6    sworn testimony of Mr. Kaller.  And it's supported by

7    Francisco Zefarino.

8                THE COURT:  Okay, but each of -- that question would

9    be for each of you, and there wouldn't be anything wrong with

10   this.

11               Did each of you tell your client that the portion of

12   the agreement -- I'm sorry.  The portion of the proposed

13   amount was -- included $16,000?  Or some number close to that?

14   It's very common on these settlement discussions to say, look,

15   it's going to be this for you and this for you.

16               MR. BAUER:  Well, Your Honor, you heard from Mr.

17   Aronauer, that --

18               MR. KIRBY:  Yeah, we did not.

19               MR. BAUER:  -- we believe he gave his client that

20   number.

21               THE COURT:  Okay.  So, your side, on the plaintiff's

22   counsel's side, Mr. Aronauer, you're saying you never told

23   your client the $16,000 number?

24               MR. ARONAUER:  No.

25               THE COURT:  All right.  And then on your side, you

1    didn't either.

2             MR. KIRBY:  And we did not either.  We did not.

3             THE COURT:  Okay.  All right.

4             MR. BAUER:  Your Honor, just in terms of whether or

5    not it's a fair settlement, in terms of again to the number, I

6    --

7             THE COURT:  Well, I'm sorry, let me -- you know, I'm

8    asking the question, but I understand you want to take a pass.

9    If that's your position, I'm not trying to pressure anyone to

10   answering it.  I just think it's something to consider, so

11   it's up to you.  I don't want to have to ask the question too

12   strongly.  So --

13            MR. BAUER:  Oh, no.  I apologize.  I was just going

14   to say, in terms of, you know, getting to the number, you

15   know, we calculated it a little bit different than defendants.

16   What I recall is that Mr. Santos told me that he was working

17   closer to somewhere I think between 50, 54 hours a week.

18   Maybe 51 hours.

19            We did not think the -- his pay was inclusive over

20   time.  So you know, we were arguing that after 40 hours he was

21   owed time and a half, and without an addition, I don't recall

22   him -- there was him telling me, I think, about being paid by

23   the Department of Labor, giving up his claims with respect to

24   Department of Labor.

25            So, you know, our position was we were going back

56

1    six years, not three.  So, you know, in terms of getting to --

2    and that's why I think it was a higher number.  I don't think

3    it was quite as low as defendant's counsel makes it out to be.

4                THE COURT:  So wait, is your number the one that got

5    the 14,800 or so?  That was giving him how many hours a week?

6    Six and a bit?

7                MR. KIRBY:  That was six and a half.

8                THE COURT:  Six and a half hours.

9                MR. KIRBY:  That's what's reflected in the -- in our

10   payroll records.  And we think it's more reasonable, given Mr.

11   Santos's own testimony to the DOL, that he was only working, I

12   think was it two and a half hours overtime each week, other

13   than the 12 he's telling his attorney.

14               THE COURT:  Okay.

15               MR. KIRBY:  Because the DOL interviews were just him

16   and the DOL.

17               THE COURT:  Right.

18               MR. KIRBY:  Nobody else was in attendance.

19               THE COURT:  So your number on plaintiff's side would

20   be another five -- or four and a half, right?  So do you have

21   any better recollection, 51 or 41.  51 or 54?

22               MR. BAUER:  I think it was 51.

23               THE COURT:  Okay.  So another four and a half hours.

24   So that would probably be another $10,000 maybe.  And you

25   didn't know anything about the DOL?

1          MR. BAUER:  I knew they were investigated by the

2    Department of Labor.  He didn't tell me that he was -- he

3    received any money that he --

4          THE COURT:  Okay.  Uh-huh.

5          MR. BAUER:  And even if he did, if he's not

6    relinquishing his claims, you know, there's no release, then I

7    don't think there's any reason why he can't go forward with

8    it.

9          THE COURT:  No, but he would get a credit, they

10   would get a credit for what they paid.

11         MR. BAUER:  Yeah, it would be --

12         THE COURT:  And --

13         MR. BAUER:  Yeah, it would be an offset.

14         MR. ARONAUER:  An off-set of $2,000, or whatever he

15   got.  But there wouldn't -- wouldn't make a huge --

16         THE COURT:  Well, right.

17         MR. KIRBY:  Yeah, for three years of overtime.

18         THE COURT:  Yeah, well, but as a practical matter in

19   a settlement, when the DOL has agreed with it --

20         MR. KIRBY:  And the DOL did their calculation on a

21   half time basis as far as overtime hours.

22         THE COURT:  Okay.

23         MR. KIRBY:  Which is why -- which is why we led with

24   that as our initial calculation.

25         THE COURT:  What did he get?  He got 2,000?

1          MR. KIRBY:  I think it was roughly around 2,000, a

2     little bit less than $2,000.

3          THE COURT:  Okay.

4          MR. KIRBY:  It's reflected in one of the exhibits.

5     I believe it was Exhibit 3.

6          THE COURT:  The interview sheet.

7          MR. KIRBY:  The interview sheet and then one of the

8     pages after that is the calculation.

9          THE COURT:  All right.  Defendant's Exhibit 3.  It

10    has time in.  So it says he worked -- so, what, 8:00 to 4:00

11    or 8:00 to 5:00.  So it's an eight hour day, and then he

12    worked from 10:00 to -- he says he worked 10:00 to 6:00.

13         MR. KIRBY:  Yeah.

14         THE COURT:  It's another eight hour day.  So it's

15    really --

16         MR. KIRBY:  And that's with an hour lunch.

17         THE COURT:  -- one hour a week.  Am I right?  Oh, he

18    worked six days a week.  Sorry.  Right?  But an hour for

19    lunch?

20         MR. KIRBY:  Correct.  Correct, with an hour for

21    lunch.

22         THE COURT:  Yeah, is that on here?

23         MR. KIRBY:  So I think it was around 42, 43 hours.

24         THE COURT:  Is the lunch on here?

25         MR. KIRBY:  I think he reflected it on the next page

1    of the interview notes that he had an hour for lunch.

2              THE COURT:  Oh, yeah.  One hour for a meal.  Okay.

3    So three hours, right?  No, sorry, that's six hours because he

4    worked the six days.  Okay.  All right.

5              So is there anything else we should hear?  And then

6    just let me get the authority that you -- the legal authority?

7              MR. KIRBY:  And we were jumping the gun, but I'm

8    prepared to go through the attorney's fees as well, if the

9    attorney's fees application is going to be ordered.  But it

10   may not be the right time to do that.

11             THE COURT:  Do you want to do that now, or do you

12   want to wait?

13             MR. KIRBY:  Obviously, if you rule to go with the

14   settlement and there's no (indiscernible) application, then --

15             THE COURT:  Right.

16             MR. BAUER:  I think it might be cleaner if we wait.

17             THE COURT:  Okay.  We could just probably do that on

18   the paper.  Okay.

19             So on this 475/any other authority that the

20   plaintiff's counsel, if it's not a global settlement, is

21   entitled to bring his own fee application separate and apart

22   from whatever money changed hands here, or not, depending

23   whichever side you're arguing for.

24             MR. BAUER:  Right.  Right.

25             THE COURT:  So I don't know what your respective

60

1    plans are.  I mean, you want to get this off your desk.  I

2    mean, it's up to you.  When would you like it?

3               MR. BAUER:  You're talking about a deadline to

4    submit --

5               THE COURT:  Yeah, yeah, yeah.  And I think a letter

6    is fine --

7               MR. KIRBY:  Yeah, and just it's --

8               THE COURT:  -- with the authority.

9               MR. KIRBY:  Are you anticipating a letter from

10   plaintiffs and us responding, or letters at the same time?

11              THE COURT:  I think letters at the same time is

12   fine.

13              MR. KIRBY:  Okay.

14              THE COURT:  This is a question of --

15              MR. BAUER:  Okay.  Okay.

16              THE COURT:  -- what the laws say.

17              MR. BAUER:  Right.  Right.  Okay.  Great.

18              THE COURT:  I don't need much application.  I get

19   it.  We've honed the question, it's just, does the right exist

20   or not.

21              MR. BAUER:  Right.

22              THE COURT:  If you find that it's not --

23              MR. BAUER:  Global settlement.

24              THE COURT:  -- global settlement.

25              MR. KIRBY:  If we can have until next Tuesday, that

```
1    would work.
2              THE COURT:  Will that work for you?
3              MR. BAUER:  I think that's fine.  I'm going to be
4    away Monday/Tuesday, but we'll endeavor to get ours done this
5    Friday and we'll just, you know, have --
6              THE COURT:  It's up to you.  Want to do that?
7              MR. BAUER:  Are you okay with that?
8              MR. KIRBY:  That's fine.
9              MR. BAUER:  Okay.
10             THE COURT:  All right.  So the 28th.
11             MR. KIRBY:  And any page limit?  I guess three pages
12   is what is stipulated?
13             THE COURT:  That doesn't matter.
14             MR. BAUER:  Okay.
15             THE COURT:  How many, you know, ten?  I don't need
16   ten though.
17             MR. KIRBY:  No, I don't --
18             THE COURT:  If you have --
19             MR. KIRBY:  I don't anticipate --
20             MR. BAUER:  No, no, no, no.
21             THE COURT:  If you have the on point Court of
22   Appeals case, I'm good with it.
23             MR. KIRBY:  Okay.
24             THE COURT:  I'm very good with it.  All right.
25   Anything else?
```

1          MR. BAUER:  No, Your Honor.

2          MR. KIRBY:  Nothing, Your Honor.

3          THE COURT:  All right.  Thanks for your time.

4          MR. ARONAUER:  Thank you, Your Honor.

5          MR. BAUER:  Thanks very much.

6      (Proceedings concluded at 11:45 a.m.)

7      I, CHRISTINE FIORE, court-approved transcriber and

8  certified electronic reporter and transcriber, certify that

9  the foregoing is a correct transcript from the official

10 electronic sound recording of the proceedings in the above-

11 entitled matter.

12

13          *Christine Fiore*

14 _____         September 4, 2018

15      Christine Fiore, CERT

16

17

18

19

20

21

22

23

24

25