UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- x
GUSTAVO SANTOS,                                         :
                                                        :
                             Plaintiff,                 :
                                                        :          **REPORT & RECOMMENDATION**
                    -against-                           :
                                                        :             16 Civ. 7107 (DLI) (VMS)
E T & K FOODS, INC., BET-ER BY                          :
FAR MEATS, INC. and THOMAS KALLER,                      :
                                                        :
                             Defendants.                :
-------------------------------------------------------- x

**VERA M. SCANLON, United States Magistrate Judge:**

Plaintiff Gustavo Santos ("Plaintiff" or "Mr. Santos") commenced this action against E T & K Foods, Inc. d/b/a Met Foods ("Met Foods"), Bet-Er By Far Meats, Inc. and Thomas Kaller (collectively, "Defendants"), seeking to recover unpaid overtime compensation under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 et seq.; earned wages and unpaid overtime compensation under the New York Labor Law ("NYLL"), N.Y. Lab. Law §§ 650 et seq.; and statutory damages for Defendants' alleged failure to furnish Plaintiff with wage statements and notices under the Wage Theft Prevention Act ("WTPA"), N.Y. Lab. Law § 195. See generally Complaint, ECF No. 1.

The Honorable Dora L. Irizarry, Chief District Judge, referred this matter to the undersigned to conduct an evidentiary hearing to determine whether a settlement was reached directly between Plaintiff and Defendants and, if so, to determine the nature of the settlement and review the settlement pursuant to Cheeks v. Freeport Pancake House, Inc., 796 F.3d 199 (2d Cir. 2015). Also before the Court, on referral from Chief Judge Irizarry, is Plaintiff's counsel's motion for attorneys' fees under Section 475 of the New York Judiciary Law. See Motion for Attorneys' Fees, ECF No. 63.

1

After carefully considering the testimonial and documentary evidence admitted at the evidentiary hearing, as well as other filings in this case, this Court finds that a global settlement of $45,000.00 was reached directly between Plaintiff and Defendants, of which $16,000.00 was earmarked for attorneys' fees and costs.  The Court respectfully recommends that this settlement be approved as fair and reasonable under Cheeks.  The Court further respectfully recommends that Plaintiff's counsel's motion for attorneys' fees be granted in part and denied in part in that a charging lien for attorneys' fees and costs be fixed at $15,605.00, enforceable against Defendants in view of Plaintiff's unavailability, and that the motion be denied to the extent Plaintiff's counsel seeks fees and costs in excess of this amount.

I.      **BACKGROUND**

        A.      **First Evidentiary Hearing**

Plaintiff commenced this action on December 25, 2016.  See Complaint, ECF No. 1. Shortly thereafter, Plaintiff's counsel, Jacob Aronauer ("Plaintiff's counsel" or "Mr. Aronauer"), filed a letter with the Court, dated January 3, 2017, alleging that Defendants were engaging in retaliatory actions against Plaintiff aimed at making Plaintiff withdraw the lawsuit.  See January 3, 2017 Letter, ECF No. 5.  In a second letter, dated April 10, 2017, Mr. Aronauer asserted additional retaliatory acts.  See April 10, 2017 Letter, ECF No. 24.  The allegations raised in the January 3, 2017 and April 10, 2017 letters were the subject of an evidentiary hearing held before the undersigned on April 24, 2017 (the "First Evidentiary Hearing").  See ECF No. 28.  In a report and recommendation (the "First R & R"), which was adopted by the District Court, the Court found that the evidence presented did not support a finding of retaliation.  See First R & R, ECF No. 36; 3/13/2018 Order Adopting First R & R.  The undersigned noted in the First R & R that it is not improper for one party to a lawsuit to communicate directly with an opposing party.

2

First R & R 12 n.4 (citing <u>Miano v. AC & R Advert., Inc.</u>, 148 F.R.D. 68, 82-83, <u>as amended</u>

(Mar. 4, 1993), <u>R & R adopted</u>, 834 F. Supp. 632 (S.D.N.Y. 1993)).  A full recitation of the facts

concerning the allegations of retaliation at issue in the First Evidentiary Hearing is set forth in

the First R & R and repeated here only as relevant to the Court's findings and recommendations

herein.

      **B.**     **Letters Regarding June 2017 Events**

On June 25, 2017, Mr. Aronauer filed a letter containing allegations concerning events

occurring subsequent to the First Evidentiary Hearing.  <u>See</u> ECF No. 34.  He alleged that on June

21, 2017, Defendant Thomas Kaller directed one of his employees, Laurentino Rodriguez, to

meet with Plaintiff to relay that Mr. Kaller wanted Plaintiff "to take $20,000[.00] plus two weeks

salary, go to Mexico and then to tell his lawyer to drop the case."  <u>Id.</u>  According to Mr.

Aronauer's June 25, 2017 letter, when Plaintiff declined, Mr. Rodriguez left a bag with

$20,940.00 in cash in Plaintiff's house without his permission.  <u>Id.</u>  The following day, June 22,

2017, Plaintiff brought the $20,940.00 to Mr. Aronauer's office.  <u>Id.</u>  Mr. Aronauer put the

money in his firm's escrow account and requested leave from the Court to return the money to

Defendants' counsel.  <u>Id.</u>

Defendants' counsel responded to Mr. Aronauer's letter, providing a different version of

events.  <u>See</u> ECF No. 35.  According to Defendants' counsel, it was Plaintiff who, within days of

the First Evidentiary Hearing in April, approached Mr. Rodriguez and asked him to arrange for

Plaintiff to speak with Mr. Kaller.  <u>Id.</u>  Mr. Rodriguez declined this initial request, but later, on

June 21, 2017, Plaintiff confided in Mr. Rodriguez that he had recently lost his job, had no

money, wanted to return to Mexico, and wanted to resolve this case, but that he was afraid that if

he did so, Mr. Aronauer would call immigration officials about Plaintiff or his family.  <u>Id.</u>  Mr.

Rodriguez, feeling sympathy toward Plaintiff, asked if Plaintiff wanted him to speak to Mr.

Kaller on his behalf.  Id.  Plaintiff responded that he would, and asked Mr. Rodriguez to tell Mr.

Kaller that Plaintiff would resolve the case for $20,940.00, which represented a $20,000.00

settlement of the overtime claims and $940.00 for Plaintiff's final two weeks of work at MET

Foods, for which he alleges he was never paid.  Id.  Mr. Rodriguez met with Mr. Kaller later the

same day and after relaying his conversation with Plaintiff, Mr. Kaller gave him $20,940.00 in

cash to give to Plaintiff.  Id.

Defendants' counsel requested that the Court order Mr. Aronauer to immediately return

the money he was holding in escrow.  Id.  In a subsequent letter, Mr. Aronauer confirmed that he

returned the $20,940.00 to Defendants on June 29, 2017.  See ECF No. 43.

### C.    Letters Regarding August 2017 Events

In a letter dated August 7, 2017, Mr. Aronauer advised the Court that he received a letter

by Federal Express on August 3, 2017 (the "Withdrawal Letter"), stating:

> To Jacob Aronauer:
>
> This is to inform you, I [G]ustavo Santos, will no longer participate
> to any lawsuit yo [sic] have brought on my behalf against E T & K
> DBA MET FOODS and BBF + [T]homas Kaller.  Not now and not
> in the future.  I want to direct you to drop and withdrawl [sic] my
> case complaints Ect [sic].  I will no longer be a party to said case.

Withdrawal Letter, Ex. B to Mr. Aronauer's August 7, 2017 Letter, ECF No. 43.  The

Withdrawal Letter appears to bear Mr. Santos's signature and to have been notarized on August

1, 2017.  Id.  Mr. Aronauer expressed his belief that a "backdoor settlement agreement" was

reached, through which Mr. Kaller "was able to settle the case without court approval in

contravention of Cheeks[,] [a]nd by doing so, [] was able to save the cost of having to pay

Plaintiff's counsel's attorney[s'] fees."  Id.  Mr. Aronauer charged Defendants' counsel with

4

having "knowledge of a backdoor settlement." Id.  Mr. Aronauer requested an evidentiary

hearing "to ascertain whether a settlement agreement was reached between the individual parties

without compliance with Cheeks," and "to determine if this office's right to attorney fees–which

is provided for under the Fair Labor Standards Act ("FLSA") and New York Judiciary Law

§ 475–was circumvented by the individual parties." Id.

Defendants' counsel filed a response, stating that on August 2, 2017, they were contacted

by Mr. Kaller, who informed them that he had reached a settlement directly with Plaintiff, and

that Plaintiff had sent correspondence to Mr. Aronauer in connection with the same via overnight

mail.  See ECF No. 45.  Defendants' counsel stated that they had not prepared or reviewed any

settlement documentation or otherwise participated in the Parties' direct settlement discussions,

and vehemently rejected as "outrageous and completely unfounded" Mr. Aronauer's claim that

they were aware of the settlement.  Id.  Defendants' counsel argued that the request for an

evidentiary hearing should be denied, that given Plaintiff's desire to withdraw the case, it should

be dismissed without prejudice, and that such a dismissal would not trigger Cheeks review.  Id.[1]

### D. Procedural History Relevant To The Evidentiary Hearing And Motion For Attorneys' Fees

On January 22, 2018, Chief Judge Irizarry issued an Order striking Mr. Aronauer's

motion for an evidentiary hearing, filed at ECF No. 43, and stating that Plaintiff's counsel may

seek the relief in that motion after the District Court's issuance of a ruling on the First R & R.

On May 9, 2018, after the District Court's Order Adopting the First R & R, Mr. Aronauer filed a

letter stating that, unless directed otherwise, he intended on moving for attorneys' fees in light of

the Court's January 22, 2018 Order, which Mr. Aronauer described as holding "that Plaintiff's

---

[1] Mr. Aronauer filed two motions purporting to "renew" the August 7, 2017 motion, see ECF
Nos. 47 & 49, which the District Court struck as duplicative.

counsel may move for attorney fees 'after the Court issues its ruling on the Magistrate Judge's Report and Recommendation.'" ECF No. 50. In response, Defendants' counsel noted that the January 22, 2018 Order stated that Mr. Aronauer "may seek the relief discussed in his" earlier motion, which was for an evidentiary hearing, not for attorneys' fees. ECF No. 51. Chief Judge Irizarry scheduled a pre-motion conference for June 21, 2018.

The day before the scheduled pre-motion conference with the District Court, Mr. Aronauer filed a motion for sanctions against Defendants and Defendants' counsel, ECF Nos. 52-54, and a motion to adjourn the pre-motion conference, ECF No. 55. Chief Judge Irizarry struck the motion for sanctions, denied the motion to adjourn the conference and directed all parties to appear for the June 21, 2018 conference, at which the Court would "consider, inter alia, whether the person who should be sanctioned is Mr. Aronauer for his continual failure to follow court rules, misstating the record and engaging in vexatious litigation." See 6/20/2018 Order.

At the pre-motion conference, Chief Judge Irizarry summarized the case history, determined that an evidentiary hearing was required "to determine whether or not a settlement was reached [and,] if so, what the settlement was," and referred the evidentiary hearing to the undersigned. The Referral Order further stated that if a settlement was indeed reached, this Court should conduct a Cheeks review of that settlement.

### E.     Mr. Aronauer's Efforts To Contact Mr. Santos

The District Court directed Mr. Aronauer to "provide documentation as to efforts he had made to contact his client." See 6/21/2018 Order. Pursuant to this Order, Mr. Aronauer submitted a declaration, dated June 27, 2018, detailing his efforts to contact Mr. Santos through multiple methods, including by telephone, by Facebook, at Mr. Santos's former apartment building, through the Mexican consulate, and through Mr. Santos's sister and brother-in-law.

6

See ECF No. 57.  Mr. Aronauer was unable to contact his client.  Id.

## II.   Evidentiary Hearing

In accordance with the referral from Chief Judge Irizarry, the undersigned conducted an evidentiary hearing (the "Evidentiary Hearing").  See Evidentiary Hearing Transcript ("Tr."), ECF No. 60.   Defendants called the following witnesses, each of whom testified under oath on direct and cross-examination: (1) Laurentino Rodriguez ("Mr. Rodriguez"), Plaintiff's former co-worker at Met Foods, Tr. 15:16-33:15; (2) Defendant Thomas Kaller, Tr. 37:6-102:15; and (3) Francisco Zeferino Moyaho ("Mr. Zeferino"), Plaintiff's former supervisor at Met Foods, Tr. 107:23-124:7.  Mr. Aronauer also testified under oath on direct examination, conducted by counsel Vincent E. Bauer, and cross-examination.  Tr. 127:15-190:1.  The Court summarizes the testimony of each witness below.

### A.   Rodriguez Testimony

Mr. Rodriguez testified that in April 2017, he declined a request from Mr. Santos to talk to Mr. Kaller about "getting [Mr. Santos] some money."  Tr. 16:9-17:1.  During a conversation on June 21, 2017, Mr. Santos told Mr. Rodriguez that he had lost his job, did not have any money, and again asked if Mr. Rodriguez could speak to Mr. Kaller about "giv[ing] [Mr. Santos] some money, so that he could go back to Mexico."  Tr. 17:9-18:5.  Mr. Santos specified that he wanted $20,000.00 plus two weeks of pay.  Tr. 18:19-22.  Mr. Rodriguez relayed Plaintiff's request to Mr. Kaller who replied that "[i]f that's what [Mr. Santos] wanted, he would give it to him."  Tr. 19:13-25.  Mr. Kaller gave Mr. Rodriguez $20,940.00 in cash to deliver to Mr. Santos. Tr. 20:5-16.  After receiving the money, Mr. Santos and Mr. Kaller met, at Mr. Santos's request, during which Mr. Santos cried and expressed his thanks to Mr. Kaller.  Tr. 22:18-23:12.

B.     **Kaller Testimony**

Mr. Kaller testified that in June 2017, he received a telephone call from Mr. Rodriguez who relayed that Mr. Santos was sorry that he ever started this case, that he wanted to go home to Mexico, and that he would like $20,000.00 plus two weeks pay.  Tr. 38:2-14.  Mr. Kaller responded "let's do it," and gave Mr. Rodriguez "almost $21,000.[00]" to give to Mr. Santos. Tr. 39:3-14.  Later the same day, Mr. Kaller agreed to meet with Mr. Santos, who apologized for bringing the case and stated that he had nothing against Mr. Kaller.  Tr. 39:15-40:10.  Mr. Santos began crying and said that he had a sick mother, that he had not seen his children in twelve years, and that he wanted to go home to Mexico.  Tr. 40:8-14.  Mr. Kaller testified that at some point thereafter, the $20,940.00 he had given to Mr. Santos was returned to him.  Tr. 41:14-16.

Mr. Kaller testified that in August 2017 he and Mr. Zeferino encountered Mr. Santos, who lived half a block from Met Foods, while Mr. Santos was walking his dog.  Tr. 42:1-7. According to Mr. Kaller, Mr. Santos "said he would like to talk to us and he was sorry again and he [was] sorry he ever gave the money back to the attorney."  Tr. 42:14-16.  After returning the dog to his house, Plaintiff and Plaintiff's sister met with Mr. Kaller and Mr. Zeferino at a bakery to talk.  Tr. 42:18-25.  Mr. Santos again stated that he was "really sorry and he felt stupid for ever giving back the money and . . . would like the money back," that his "mother was sick in Mexico," that he had children that he had not seen in twelve years, and that "he would like to go home" and "want[ed] this finished."  Tr. 43:8-15, 80:12-16.  Mr. Kaller told Mr. Santos that that was "not a problem[,] [w]e can do that."  Tr. 43:17-17.  Mr. Santos stated that he wanted to "talk to his lawyer and tell him he wanted to drop the case," and that he would reach out to Mr. Kaller and Mr. Zeferino the following day after speaking with his attorney.  Tr. 43:20-44:3, 87:8-12.

The following day, Mr. Santos called Mr. Kaller and Mr. Zeferino, and said that he had spoken with his attorney, that he was ready to make a deal and drop the case, and that Mr. Kaller and Mr. Zeferino should come over to Plaintiff's house.  Tr. 44:16-20.  Mr. Kaller and Mr. Zeferino went to Plaintiff's house, where Plaintiff, Plaintiff's sister and Plaintiff's brother-in-law were present.  Tr. 44:21-45:6.  According to Mr. Kaller, Mr. Santos stated that he had told his attorney of his desire to drop the case and go to Mexico, that his attorney had said he was "out $16,000[.00] in this case" and had said to Mr. Santos, "give me $16,000[.00] and do whatever you want."  Tr. 45:8-12; see Tr. 88:23-25.  Mr. Santos asked Mr. Kaller for $45,000.00 and specified: "$16,000[.00] for my attorney, $29,000[.00] for me."  Tr. 45:12-20; see Tr. 89:2-4.  Mr. Kaller agreed to that amount and gave Mr. Santos $45,000.00 in cash that he had brought to the meeting.  Tr. 45:21-25.[2]  Mr. Kaller testified that it was his understanding that Mr. Santos was going to deliver $16,000.00 to his attorney.  Tr. 46:2-5.

Mr. Kaller brought two documents to the meeting for Mr. Santos to sign, with Spanish translations of each, which Mr. Kaller had prepared in his office earlier that day with the assistance of Mr. Zeferino's son (hereinafter, the "Settlement Documents").  Tr. 48:20-55:6, 95:20-102:1.  One of the documents was the Withdrawal Letter addressed to Mr. Aronauer, discussed in Section I.C. above, directing Mr. Aronauer to withdraw the case.  Tr. 51:15-17; Defendants' Exhibit 1.  The other document was addressed to Mr. Kaller, and stated:

> This is to inform you, I [G]ustavo Santos, will no longer participate to any lawsuit brought against you on my behalf.  Also, against the following: E T & K DBA MET FOODS, BET-TTER by FAR MEATS, and Thomas Kaller, not now and not in the future.  I want to direct you to drop and withdraw[l] [sic] my case complaints Ect [sic].  I will no longer be a party to said case.

---

[2] Mr. Kaller testified that he had brought a bag containing $50,000.00 in cash to the meeting.  Tr. 57:1-4.

See Defendants' Exhibit 2.  Mr. Kaller testified that at the meeting, Mr. Santos reviewed and signed the Settlement Documents, and Mr. Santos's sister and brother-in-law signed as witnesses.  Tr.  52:19-53:1, 96:3-23.

Mr. Kaller testified that the next day, he and Mr. Zeferino met with Mr. Santos at his house for the purpose of picking up notarized versions of the documents.  Tr. 46:16-20, 91:22-92:2.  During this meeting, Mr. Santos stated that he had gone to his attorney's office, but that his attorney was not there, so he spoke to a "secretary or somebody in the office" who told Mr. Santos that he did not have to pay anything [to his attorney] and that he was free to drop the case anytime he wants.  Tr. 46:20-47:1.

While Mr. Kaller and Mr. Zeferino were at Mr. Santos's house, Mr. Santos received a call from Mr. Aronauer.  Tr. 47:3-11.  Mr. Kaller did not hear what Mr. Aronauer told Mr. Santos, but Mr. Santos described Mr. Aronauer as stating "[j]ust come into my office and you don't owe me anything.  You don't have to pay me any fee.  All you have to do is just come to my office, talk to me.  You owe me nothing."  Tr. 47:13-48:3; see Tr. 93:11-19, 94:16-20.  Mr. Kaller told Mr. Santos, "if you're not going to give the money to your attorney, then give it back to me."  Tr. 48:11-12.  In response, Mr. Santos "just looked, he didn't answer[,] he [did not] say anything," and Mr. Kaller "never saw him after that night again."  Tr. 48:14-16; see Tr. 94:3-95:1.  According to Mr. Kaller, Mr. Santos "avoided me[] as well . . . .  He was gone[,] [o]ut of my life."  Tr. 48:16-19.

### C.    Zeferino Testimony

Mr. Zeferino testified that in August 2017, he and Mr. Kaller met Mr. Santos, who asked to have a conversation with them.  Tr. 109:22-110:14.  Mr. Santos, Mr. Santos's sister, Mr. Kaller and Mr. Zeferino met at a cafe, where Mr. Santos "asked [Mr. Kaller] for forgiveness,"

and stated that he did want to proceed with the lawsuit anymore, and that he was going to speak with his lawyer about withdrawing the case.  Tr. 110:15-111:23.   The following day, Mr. Zeferino and Mr. Kaller met with Mr. Santos at Mr. Santos's house, and, according to Mr. Zeferino, Mr. Santos stated that he had spoken with his attorney who had told Mr. Santos that if he wanted to drop the case, Mr. Santos had to give $16,000.00 to the attorney.  Tr. 112:7-19. Mr. Santos asked Mr. Kaller for $45,000.00, explaining that $16,000.00 was for the attorney, and the remaining $29,000.00 for Mr. Santos.  Tr. 112:20-25.  Mr. Kaller accepted the proposal and gave Mr. Santos $45,000.00 at the meeting.  Tr. 113:1-4.  Mr. Zeferino testified that during that meeting, Mr. Santos's attorney called and told Mr. Santos that "he wasn't to be upset about anything because he didn't owe him anything" and that he wanted Mr. Santos to stop by the attorney's office.  Tr. 115:9-16, 116:14-18.  The following day, Mr. Zeferino accompanied Mr. Santos to have the Settlement Documents notarized.  Tr. 117:15-118:1, 120:5-10.[3]

### D.    Aronauer Testimony

Mr. Aronauer provided testimony regarding his attorneys' fees and costs in this action, and the Court admitted into evidence an invoice for attorney and paralegal fees and costs.  Tr. 127:15-133:10.  Defendants' counsel cross-examined Mr. Aronauer regarding his fees and costs, Mr. Aronauer's conduct in this case and statements made by Mr. Aronauer in court filings concerning Defendants and Defendants' counsel.

---

[3] There are some discrepancies between Mr. Zeferino's testimony and Mr. Kaller's testimony concerning the timing of the call from Mr. Aronauer to Plaintiff.  Mr. Kaller testified that this call occurred during a meeting with Mr. Santos that took place the day following the delivery of the $45,000.00.  Tr. 47:3-48:3.  Mr. Zeferino testified that the phone call occurred during the same meeting as the exchange of the $45,000.00, and that there was no meeting involving Mr. Kaller the following day.  Tr. 115:9-16, 116:14-18.  The Court need not resolve this discrepancy as it does not impact the Court's analysis set forth below.

Regarding the issue of settlement, Mr. Aronauer was asked by the Court whether his view is that "there is a settlement in this case," and answered "[y]es." Tr. 172:4-10. Mr. Aronauer also answered in the affirmative when asked whether it is his "understanding that there was . . . money given by Mr. Kaller to Mr. Santos in August of 2017." Tr. 172:24-173:2. As to the basis for his belief that money was given by Mr. Kaller to Mr. Santos, Mr. Aronauer testified that he does not "think that Mr. Santos would have sent me the letter telling me to withdraw the case unless he was given something of value by Mr. Kaller." Tr. 173:5-15. Mr. Aronauer testified that he has "no idea what the amount was, you know, just based upon the testimony today, it appears that there was some kind of an exchange." Tr. 174:18-21. Mr. Aronauer further testified that he has no knowledge of Plaintiff visiting his office in August 2017. Tr. 174:5-11. When asked if he had "a communication by phone with Mr. Santos in August of 2017," Mr. Aronauer responded, "I don't remember if I did or if I didn't." Tr. 175:12-15. When asked if at any point, he told Mr. Santos that he "needed to come to [his] office in August of 2017," Mr. Aronauer responded that he did not recall. Tr. 175:16-21." When asked whether he ever called Mr. Santos and tell him that he did not owe Mr. Aronauer anything, Mr. Aronauer stated, "no." Tr. 175:22-24. When asked whether he communicated to Mr. Santos "that [his] fees were approximately $16,000[.00] in the summer of 2017," Mr. Aronauer stated, "[t]he answer is I don't recall doing something like that. It doesn't seem like that would be the type of conversation I would usually have with that type of client," by which he means "an unsophisticated client who probably does not really have a comprehension of what attorneys' fees are, how it works." Tr. 176:6-20. When asked whether he thought the settlement was reached through the use of "[a]ny sort of threat beyond the business transaction of settling a case for $45,000[.00]," Mr. Aronauer responded, "[n]o." Tr. 185:18-24. When asked whether he

12

believed the settlement of $45,000.00 was "fair and reasonable," Mr. Aronauer stated, "[y]es."

Tr. 185:25-186:2.

## III.    MOTION FOR ATTORNEYS' FEES

The Court held oral argument following the Evidentiary Hearing, and directed the parties

to submit letters with authority supporting their respective positions regarding Mr. Aronauer's

request for attorneys' fees.  See ECF No. 62.  Mr. Aronauer's submission in response to the

Court's order was filed as a "Motion for Attorney[s'] Fees," in which Mr. Aronauer argued:

> It is undisputed that Plaintiff Gustavo Santos settled directly with
> Defendants.   It is also undisputed that Plaintiff's counsel Jacob
> Aronauer did not receive attorney[s'] fees and expenses from the
> cash (currency) settlement directly received by Santos from
> Defendants.   Accordingly, the law is clear that Plaintiff's counsel is
> permitted to recover from the Defendants attorney[s'] fees pursuant
> to New York Judiciary Law § 475.

Motion for Attorneys' Fees, ECF No. 63.   Mr. Aronauer further argued that "[a]s attorney[s']

fees are statutorily provided for under the FLSA and the NYLL, Plaintiff's counsel should

receive not just attorney[s'] fees for work that led to the settlement, but also monies for the work

they had to perform in order to obtain their statutorily required attorney[s'] fees."  Id.

Defendants' counsel filed a letter "re[garding] Supplemental Authority as to New York

Judiciary Law § 475," arguing that "since Defendants neither (i) still possess the settlement

proceeds, nor (ii) paid the settlement proceeds to Plaintiff to knowingly deprive Mr. Aronauer of

his attorneys' fees, Mr. Aronauer cannot proceed directly against Defendants for the recovery of

such fees."  ECF No. 64.

IV.    **ANALYSIS**

A.    **Findings Of Fact**

The Court finds that the evidence reveals the following facts material to the Court's

conclusions and recommendations:

(1)   In late July or early August 2017, Mr. Kaller had a conversation with Mr. Santos, at

Mr. Santos's suggestion, in which Mr. Santos expressed regret about giving to his attorney the

$20,940.00 he had previously received from Mr. Kaller, told Mr. Kaller that he would like to

make another deal, and stated that was going to speak with his attorney about dropping the case.

Tr. 42:1-43:20, 87:8-12 (Kaller testimony); Tr. 109:22-111:23 (Zeferino testimony).

(2)   The following day, Mr. Kaller met with Mr. Santos, who told Mr. Kaller that he had

spoken with his attorney and asked Mr. Kaller for $45,000.00, of which, Mr. Santos specified,

$29,000.00 was for him and $16,000.00 was for his attorney.  Tr. 44:16-45:20, 88:23-89:4

(Kaller testimony); Tr. 112:7-25 (Zeferino testimony).

(3)   Mr. Kaller gave Plaintiff $45,000.00 in cash during that meeting. Tr. 45:21-46:5

(Kaller testimony); Tr. 113:1-4 (Zeferino testimony).  It was Mr. Kaller's understanding when he

gave Mr. Santos the $45,000.00 that Mr. Santos was going to deliver $16,000.00 to Mr.

Aronauer.  Tr. 46:2-5 (Kaller testimony); Tr. 112:20-25 (Zeferino testimony).

(4)   Mr. Santos signed two documents provided by Mr. Kaller (as well as Spanish

translations of each), one of which was addressed to Mr. Aronauer directing him to withdraw the

case, and the other to Mr. Kaller stating that Mr. Santos was withdrawing the case, which were

witnessed by Mr. Santos's sister and brother-in-law, and later notarized.  Tr. 48:20-55:6, 95:20-

102:1 (Kaller testimony); Tr. 117:15-118:1, 120:5-10 (Zeferino testimony); Defendants' Exhibits

1 & 2.

(5)   Mr. Santos never gave to Mr. Aronauer any of the $45,000.00 he received from Mr. Kaller, and neither Mr. Kaller nor Mr. Aronauer has heard from Mr. Santos since August 2017 through the date of the hearing.  Tr. 48:14-19 (Kaller testimony); Tr. 117:6-10 (Aronauer testimony).

(6)   There was no evidence offered that Defendants' counsel facilitated or had knowledge of the settlement directly between Mr. Santos and Defendants until after it was consummated.

(7)   Mr. Santos is not available for Mr. Aronauer to make a motion for him to pay Mr. Aronauer's attorneys' fees.  ECF No. 57.

**B.      A Global Settlement Was Reached**

The evidence before the Court establishes that a settlement was reached directly between Plaintiff and Defendants pursuant to which Mr. Kaller paid Mr. Santos $45,000.00 in exchange for Mr. Santos signing a letter instructing Mr. Aronauer to withdraw the suit and a letter to Mr. Kaller stating that Mr. Santos was withdrawing his claims.  This is not disputed by either Plaintiff's counsel or Defendants' counsel.  See Transcript of 8/21/2018 Oral Argument ("Oral Arg.") 3:14-18, ECF No. 65 (Plaintiff's counsel: it "seems plain from the testimony that an agreement was reached, whereby [i]n exchange for $45,000[.00], [P]laintiff would sign a document instructing his attorney, Mr. Aronauer, to withdraw the action.  So we believe, you know, there was an agreement"); Oral Arg. 26:24-25 (Defendants' counsel: "it is our position that this is a global settlement").

With respect to whether the settlement was global, Plaintiff's counsel argues that "the record is devoid of any evidence that a global settlement was reached."  Oral Arg. 5:9-11.  The Court disagrees.  Mr. Kaller and Mr. Zeferino both testified credibly that Mr. Santos told them he

had spoken with his attorney prior to asking for $45,000.00, and that Mr. Santos specified that

$16,000.00 of that amount was for his attorney.  It was the understanding of Mr. Kaller, and

seemingly of Mr. Santos, that the settlement was global.  Plaintiff's counsel characterizes Mr.

Kaller's testimony on this issue as "simply not credible," Oral Arg. 6:1-5, but he presents no

contrary evidence.  In addition, for the reasons discussed in Section III.C below, the settlement

was a very good one for Mr. Santos, including payment of attorneys' fees and costs, which

supports the conclusion that it was a global settlement.

In sum, the Court finds that that the $45,000.00 settlement reached directly between

Plaintiff and Defendants was a global settlement that included $16,000.00 in attorneys' fees and

costs.

### C.    <u>Cheeks</u> Review

To approve an FLSA settlement, this Court must be satisfied that the agreement is

"fair and reasonable."  <u>See, e.g.</u>, <u>Pena v. San Miguel Transp., Inc.</u>, No. 14 Civ. 1463 (WHP),

2015 WL 1938144, at *1 (S.D.N.Y. Apr. 7, 2015).  In considering whether to approve an FLSA

settlement, courts consider whether the agreement "reflects a reasonable compromise of disputed

issues rather than a mere waiver of statutory rights brought about by an employer's

overreaching."  <u>Tillman v. Luray's Travel</u>, No. 14 Civ. 105 (NGG) (JO), 2015 WL 7313867, at

*1 (E.D.N.Y. Nov. 20, 2015).  Here, neither side contends that a settlement consisting of

$29,000.00 for Plaintiff and $16,000.00 for attorneys' fees and costs is not fair and reasonable.[4]

---

[4] Defendants' counsel affirmatively stated their view that the settlement "is more than reasonable and fair under <u>Cheeks</u>."  Oral Arg. 30:12-14.  Plaintiff's counsel refrained from taking a formal position with respect to the fairness of the settlement, but Mr. Aronauer's counsel, Mr. Bauer, stated at oral argument that if a global settlement of $45,000.00 "were presented to us that - - you know, that number might have worked . . . ."  Oral Arg. 47:19-25.  At the evidentiary hearing, Mr. Aronauer testified that he believed the settlement was fair and reasonable.  Tr. 185:25-186:5.

As to the merits, the Complaint in this action alleges that from 2004 through December 2, 2016, Plaintiff worked as a "stock, produce and meat clerk" at Met Foods.  Compl. ¶ 10.  The Complaint alleges that during that time, Plaintiff worked Monday through Saturday from 10:00 a.m. to 8:00 p.m. with one hour for lunch–a total of 54 hours per week–and was paid a flat salary of $400.00 per week, which increased to $470.00 per week in November 2016.  Id. ¶¶ 39, 47-51. According to the Complaint, Plaintiff's weekly pay covered only the first 40 hours worked per week and did not include compensation for the 14 overtime hours worked per week.  Id. ¶ 40.

According to Defendants, Plaintiff was generally scheduled to work on Tuesday, Wednesday, Thursday, Friday, and Saturday from 11:00 a.m. until 8:00 p.m., and on Sunday from 10:30 a.m. until 6:00 p.m., with one hour for lunch, for a total of 46.5 hours per week.  See ECF No. 15; Oral Arg. 31:10-11.  Defendants maintain that Plaintiff's $400.00 weekly pay covered the first 40 hours worked by Plaintiff at his regular rate of pay, and time-and-a-half for each overtime hour worked by Plaintiff.  Id.; Oral Arg. Tr. 31:12-15.  Accordingly, it is Defendants' view that Plaintiff was paid for all hours that he worked.  Id.; Oral Arg. 30:14-24. Defendants have further contended that Plaintiff's allegation that he worked approximately 54 hours per week is contradicted by Plaintiff's own representations to the New York State Department of Labor ("DOL"), made during a DOL audit of Met Foods, that he worked 42 to 43 hours per week.  Id.

In support of their position, the Court admitted into the evidence the following records offered by Defendants at the Evidentiary Hearing: (1) records from a 2014 DOL audit of MET Foods, Exhibit 3; (2) records kept by Defendants showing Mr. Santos's weekly schedule, hourly rate of pay and overtime rate of pay, Exhibit 4; (3) Plaintiff's weekly pay schedules from October 6, 2013 to December 3, 2016, Exhibit 5.  See Tr. 57:8-70:5.  According to the DOL

17

audit records, DOL found that for the approximately three-year period of October 22, 2011 to October 18, 2014, Mr. Santos was underpaid a total of $1,320.95.[5]  See Exhibit 3.  As part of the audit, the DOL conducted an interview with Mr. Santos, as reflected on a DOL "interview sheet," in which Mr. Santos stated that he worked between 42 and 43 hours per week and was paid $380.00 per week during the audit period.  Id.

At oral argument, although not admitting liability, Defendants' counsel stated that assuming Plaintiff's weekly pay covered 46.5 hours per week at the regular rate of pay, but did not include time-and-a-half for the 6.5 overtime hours, Plaintiff's overtime damages would be $4,264.14.  Oral Arg. 31:7-33:3.  With liquidated damages, Mr. Santos's maximum damages would be $8,528.28.  In the alternative, assuming that Plaintiff's weekly pay covered only the first 40 hours worked per week and no compensation at all for the 6.5 overtime hours worked per week, Plaintiff's overtime damages would be $14,871.00.  Oral Arg. 33:5-8.  With liquidated damages, his maximum damages would be $29,742.00.  Mr. Aronauer submitted a spreadsheet reflecting his firm's assessment of potential damages, attached to his declaration filed at ECF No. 53, which shows that Mr. Aronauer calculated a maximum recovery for unpaid overtime damages (not including liquidated damages) of $30,276.19.[6]

Given the documentary evidence submitted by Defendants, the documentation from the DOL audit, including Mr. Santos's statements in his interview with DOL, and the calculations

---

[5] Mr. Kaller testified that he paid DOL $1,651.19 to resolve the audit, which included the $1,320.95 underpayment plus a 25% penalty of $330.24.  Tr. 60:5-13.

[6] The foregoing calculations do not include interest or damages for violations of the New York Labor Law's wage notice and statement requirements.  The Court notes that "an employee who began working before the WTPA took effect on April 9, 2011, may not bring a claim for an employer's failure to provide wage notices."  Canelas v. A'Mangiare Inc., No. 13 Civ. 3630 (VB), 2015 WL 2330476, at *5 (S.D.N.Y. May 14, 2015).  Mr. Santos may have limited additional claims under New York law.

discussed above, the Court finds that the $29,000.00 designated for Plaintiff is a very favorable settlement amount for Plaintiff.  This is because given the documentary evidence, Defendants had a reasonable likelihood of proving that they owed Mr. Santos little or nothing under federal law, and even if Mr. Santos were to succeed on all of his federal claims, he would not have recovered much more than the settlement with Mr. Kaller, which paid him almost one hundred percent of his overtime damages.  Given the significant risk of no or minimal recovery, the settlement was entirely fair and reasonable.

With respect to attorneys' fees and costs, $16,000.00 is approximately equal to one-third of the total settlement amount plus costs incurred through the date of the settlement, which is the agreed-upon contingency arrangement in Mr. Aronauer's retainer agreement with Mr. Santos, as discussed further in Section IV.D.2 below.  "[A] one-third contingency fee is a commonly accepted fee in this Circuit."  Ezpino v. CDL Underground Specialists, Inc., No. 14 Civ. 3173 (DRH) (SIL), 2017 WL 3037483, at *3 (June 30, 2017), R & R adopted, 2017 WL 3037406 (E.D.N.Y. July 17, 2017); see Lopez v. YTS Trading LLC, No. 16 Civ. 2091 (DLI) (JO) (E.D.N.Y. Feb. 8, 2017), Order Adopting Report and Recommendations (finding FLSA settlement agreement that included attorneys' fees of one-third pursuant to a retainer agreement fair and reasonable); Ragnauth v. Dynamic Adiv Sethi Corp, No. 14 Civ. 4472 (DLI) (RLM) (E.D.N.Y. Jan. 6, 2015), Order (dismissing case following magistrate judge's finding that the FLSA settlement "is fair and reasonable and that the attorney's fees (a one-third contingency, based on a written retainer agreement) are also fair and reasonable"); Rangel v. 639 Grand St. Meat & Produce Corp., No. 13 Civ. 3234 (LB), 2013 WL 5308277, at *1 (E.D.N.Y. Sept. 19, 2013) (approving attorneys' fees of one-third of FLSA settlement amount, plus costs, pursuant to plaintiff's retainer agreement, and noting that such a fee arrangement "is routinely approved by

19

the courts in this Circuit").  Viewed in the context of the favorable recovery by Plaintiff, the Court respectfully recommends that the Court find the amount of the settlement earmarked for attorneys' fees and costs to be reasonable.

The Court, having reviewed the evidence presented, having assessed the claims and defenses, and having considered the applicable case law, respectfully recommends that the settlement be approved as fair and reasonable under Cheeks v. Freeport Pancake House, Inc., 796 F.3d 199 (2d Cir. 2015).

**D.    Attorneys' Fees Under Section 475 Of The New York Judiciary Law**

**1.    Entitlement To A Charging Lien Enforceable Against Defendants**

"A charging lien is a security interest in the favorable result of litigation, giving the attorney equitable ownership interest in the client's cause of action," Antonmarchi v. Consol. Edison Co. of N.Y., 678 F. Supp. 2d 235, 240 (S.D.N.Y. 2010) (quoting Chadbourne & Parke, LLP v. AB Recur Finans, 18 A.D.3d 222, 223 (1st Dep't 2005)), and "ensur[ing] that the attorney can collect his fee from the funds that were obtained on behalf of his client as a result of the attorney's labors," Luca v. Giaccone, No. 16 Civ. 04975 (PKC) (ARL), 2017 WL 3669614, at *3 (E.D.N.Y. Aug. 24, 2017) (citing Rosenman & Colin v. Richard, 850 F.2d 57, 61 (2d Cir. 1988)).  The charging lien is codified in Section 475 of New York's Judiciary Law ("Section 475"), which provides that:

> [f]rom the commencement of an action, special or other proceeding in any court or before any state, municipal or federal department . . . the attorney who appears for a party has a lien upon his or her client's cause of action, claim or counterclaim, which attaches to a verdict, report, determination, decision, award, settlement, judgment or final order in his or her client's favor, and the proceeds thereof in whatever hands they may come; and the lien cannot be affected by any settlement between the parties before or after judgment, final order or determination. The court upon the petition of the client or attorney may determine and enforce the lien.

20

N.Y. Jud. Law § 475.  The Second Circuit has "long recognized that the lien created by [S]ection 475 . . . is enforceable in federal courts in accordance with its interpretation by New York Courts."  In re Chesley v. Union Carbide Corp., 927 F.2d 60, 67 (2d Cir. 1991); see Itar-Tass Russian News Agency v. Russian Kurier, Inc., 140 F.3d 442, 448 (2d Cir. 1998) (Section 475 "governs attorneys' charging liens in federal court sitting in New York"); Markasis v. S.S. Mparmpa Christos, 267 F.2d 926, 927 (2d Cir. 1959) (Section 475 "creates an equitable right and remedy cognizable in the federal courts").  "The statute is remedial in character, and hence should be construed liberally in aid of the object sought by the legislature, which was to furnish security to attorneys by giving them a lien upon the subject of the action."  Itar-Tass, 140 F.3d at 450 (quoting Fischer-Hansen v. Brooklyn Heights R. Co., 173 N.Y. 492, 499 (N.Y. 1903)); see Stair v. Calhoun, 722 F. Supp. 2d 258, 267 (E.D.N.Y. 2010) ("New York's statutory charging lien . . . is a device to protect counsel against 'the knavery of his client,' whereby through his effort, the attorney acquires an interest in the client's cause of action." (quoting In re City of New York, 5 N.Y.2d 300, 307 (N.Y. 1959))).

An attorney's lien under Section 475 "comes into existence, without notice or filing, upon commencement of the action or proceeding," DeCastro v. Kavadia, No. 12 Civ. 1386 (JMF), 2018 WL 4771528, at *3 (S.D.N.Y. Oct. 3, 2018) (quoting LMWT Realty Corp. v. Davis Age Inc., 85 N.Y.2d 462, 467 (N.Y. 1995)), and "attaches not only to any judgment that the client may obtain, but also to the proceeds of any settlement between the parties to the underlying action," Haggard Int'l Corp. v. United Co. for Food Indus. Corp., No. 03 Civ. 5789 (CLP), 2013 WL 3356953, at *2 (E.D.N.Y. July 3, 2013).  "In the event of settlement, the attorney's lien attaches to the fund representing the cause of action extinguished by the settlement."  In re Shirley Duke Assocs., 611 F.2d 15, 18 (2d Cir. 1979); see Fischer-Hansen,

173 N.Y. at 502 (explaining that "a lien upon a claim or a cause of action follows the fund created by a settlement of the claim[,] . . . leap[ing] from the extinguished cause of action to the amount agreed upon in settlement").  The lien "attaches to the amount agreed upon in settlement the instant the agreement is made, and if the defendant pays over to the client without providing for the lien of the attorney, he violates the rights of the latter and must stand the consequences." Fischer-Hansen, 173 N.Y. at 502.

"New York courts have imposed an affirmative duty upon defendants who know of a charging lien of an adverse party's attorney to protect such a lien."  Union Carbide, 1993 WL 541230, at *3; see Watson v. Nosal Realty, LLC, 2002 WL 1592603, at *2 (Sup. Ct. Kings Cnty. 2002) (noting that in furtherance of Section 475's "salutary goal" of "furnishing security to attorneys by giving them a lien upon the subject of the action," New York courts have made clear that "a defendant who settles a cause of action with a plaintiff, without the plaintiff's attorney's knowledge, has the duty to determine the amount due the plaintiff's attorney and retain it for him").  "In fact, the law 'conclusively assumes [the defendant] has retained[] sufficient [funds] to pay the sum which the plaintiff was entitled to receive.'"  Watson, 2002 WL 1592603, at *2 (quoting Sargent v. McLeod, 209 N.Y. 360, 365 (N.Y. 1913)).  "Failure to do so renders [the defendant] liable for the value of the services and disbursements of his opponent's attorney."  Id. at *2 (alterations in original) (quoting Ozorowski v. Pawlowski, 207 Misc. 407, 409 (Sup. Ct. Montgomery Cnty. 1955)).  This is so even where a defendant "has a good faith belief that some event . . . extinguished the charging lien," Schneider, Kleinick, Weitz, Damshek & Shoot v. City of New York, 302 A.D.2d 183, 188 (1st Dep't 2002), or in good faith pays the entire proceeds of a global settlement to a person other than the attorney asserting a charging lien, and that person absconds without giving the attorney asserting a charging lien his or her

22

share of proceeds, see Sherman & Basichas, LLP v. Geico Gen. Ins. Co., 8 Misc.3d 1013(A)

(Civil Ct. N.Y. Cnty. 2005) (finding that where defendant issued a single settlement check made

payable to both the plaintiff's prior attorney and successor attorney, mailed the check to the

successor attorney, and the successor attorney absconded with the entire settlement proceeds, the

defendant was liable to the prior attorney for her share of the attorneys' fees).

Where a settlement reached directly between a defendant and a plaintiff is found to be

"collusive and fraudulent," New York courts have held that the defendant and plaintiff are jointly

and severally liable for the attorneys' fees of the plaintiff's counsel.  See, e.g., Haser v. Haser,

271 A.D.2d 253, 255 (1st Dep't 2000) ("Under New York law, a plaintiff's attorney may enforce

her statutory charging lien against the defendant's own assets, if he still possesses the settlement

proceeds or knowingly paid them to the plaintiff so as to deprive the attorney of her

compensation.  The lien which attaches in the attorney's favor cannot be impaired by a collusive

settlement."  (internal citations omitted)); Petition of Epstein & Furman, 189 A.D.2d 738, 738

(1st Dep't 1993) (all parties individually and severally liable for law firm's fees where "[t]he

record [was] clear that the intent of all parties to the settlement indemnification agreement was to

deprive petitioner law firm of its fee").

In the event of a settlement directly between the defendant and the plaintiff without

evidence of collusion or fraud, courts have held that the client becomes primarily liable to pay

the attorney for the attorney's services and the defendant is secondarily liable.  See, e.g.,

Morehouse v. Brooklyn Hgts. R.R. Co. 185 N.Y. 520, 524 (N.Y. 1906) (where defendant settled

directly with the plaintiff "honestly . . . [and] not for the purpose of defrauding the plaintiff['s

attorney] out of his compensation," the plaintiff "became primarily liable to pay [his counsel] for

his services in the litigation, and the defendant company only became liable to pay in case

collection through execution against [plaintiff] could not be made").  In such circumstances, the plaintiff's counsel can collect from the defendant when unable to collect from the plaintiff, such as where the plaintiff is insolvent or has left the court's jurisdiction.  See Fischer-Hansen, 173 N.Y. at 492 (awarding judgment against defendant the plaintiff, "who was financially irresponsible, returned to Norway, his native country, where he has since remained"); Peri v. N.Y.C. & H.R.R. Co., 152 N.Y. 521, 524-27 (N.Y. 1897) (awarding judgment against defendant where plaintiff was "insolvent except as to the amount of [settlement] money paid [to] him . . . [and] within a few days after receiving the money [] left this country and returned to Italy"); Housni v. Garcia, 29 Misc. 3d 1204(A), (Sup. Ct. Queens Cnty. 2010) (charging lien could be asserted against defendant where plaintiff's counsel was "unable to locate plaintiff"); Watson, 2002 WL 1592603, at *1-2 (charging lien could be asserted against defendant where plaintiff "vanished without paying his lawyer").

Here, the Court finds that the settlement reached directly between the parties was not a "collusive" or "fraudulent" settlement designed to deprive Mr. Aronauer of his attorneys' fees. Mr. Kaller testified credibly that at the time he paid the $45,000.00 to Mr. Santos, his understanding was that Mr. Santos would deliver to Mr. Aronauer $16,000.00 of those proceeds earmarked for attorneys' fees.  Mr. Kaller further testified that his motivation to conclude a direct settlement with Mr. Santos was based, in part, on his own accumulating attorneys' fees. See Tr. 79:12-25 ("I was tired because I've spent hundreds of thousands of dollars defending myself in this case with paperwork that Mr. Aronauer has submitted to the Court continuously erroneously, fictitiously and my attorneys have to answer that and they cost a lot of money . . . . So that's why I brought the money because I wanted it finished and here I am again.").  This understanding was consistent with Mr. Zeferino's reporting of events with Mr. Santos.

Nonetheless, by paying the money directly to Mr. Santos, even though he believed Mr. Santos was going to deliver that money to Mr. Aronauer, Mr. Kaller did so at his "own peril." See Sherman, 8 Misc.3d, at 1013.  It is undisputed that Mr. Aronauer never received from Mr. Santos the $16,000.00 allocated to him.  Under Section 475, Defendants had an affirmative duty to protect Mr. Aronauer's lien.  See Stair, 722 F. Supp. 2d at 267.  Based on Mr. Aronauer's uncontested and unsuccessful efforts to contact Mr. Santos, see ECF No. 57, and Mr. Santos's expressed intent to returning to Mexico for family reasons, the Court finds that Mr. Santos is unavailable to pay for the fees and costs.  Mr. Aronauer is entitled to collect upon his charging lien directly against Defendants.

### 2.    Amount of Lien

As for the amount at which the charging lien should be fixed, Mr. Aronauer has submitted a copy of his retainer agreement with Mr. Santos which provides for a contingency fee of one-third of any recovery plus reimbursement of costs.[7]  "[W]here a client enters into a contingent fee agreement with an attorney, and subsequently, without discharging the attorney, settles the case directly with the defendant, the attorney may assert his statutory lien against the settlement proceeds, and collect the contracted-for percentage from that recovery."  Cook v.

---

[7] Mr. Aronauer originally submitted an incomplete Spanish-language version of the retainer agreement.  See ECF No. 52, Exhibit B.  In response to the Court's Order to provide a complete copy, Mr. Aronauer filed both a complete Spanish-language version, ECF No. 67-1, and an uncertified English-language translation, ECF No. 66.  The translated, English-language version of the retainer agreement states: "You agree that a reasonable contingency compensation of the Firm will be the highest of A or B of the following," and then lists only an option "A."  See ECF No. 66.  Mr. Aronauer explained that option "B" was "inadvertently missing from Mr. Santos'[s] retainer agreement.  I offer no excuse for this oversight."  See ECF No. 66.  Mr. Aronauer may have intended to include a lodestar calculation as option "B," see Tr. 188:8-11 (testimony from Mr. Aronauer that he "believe[d]" that the retainer agreement had an alternative provision for a lodestar calculation), but there is no basis for the Court to look beyond the terms contained in the agreement.

Moran Atl. Towing Corp., 79 F.R.D. 392, 395 (S.D.N.Y. 1978); see Ward v. Donovan, 235 N.Y.

240 (N.Y. 1923); Matter of Reisfeld, 227 N.Y. 137 (N.Y. 1919).[8]  As Mr. Aronauer had not been

discharged by Mr. Santos prior to the settlement, Mr. Aronauer is entitled to a charging lien in

the amount of $15,000.00–which is one-third of the $45,000.00 settlement amount–plus costs.

The invoice submitted by Mr. Aronauer shows $1,155.00 in costs incurred as of the date of

settlement, of which $400.00 is for the court filing fee, $205.00 is for service of process, and

$550.00 is for "[t]ranslator services."  See Invoice, Plaintiff's Exhibit 1.  It is respectfully

recommended that the $605.00 for the filing and service costs be included in the charging lien,

but not the cost for the translator services which appear to be related to the First Evidentiary

Hearing concerning Plaintiff's rejected sanctions motion, which was not undertaken in

furtherance of the settlement.

Based on the foregoing, it is respectfully recommended that a charging lien for attorneys'

fees and costs in the amount of $15,605.00 be fixed by the Court.

---

[8] Had Mr. Santos discharged Mr. Aronauer prior to making a settlement with Defendants, the amount of Mr. Aronauer's charging lien would have been computed on the basis of quantum meruit.  See Cook, 79 F.R.D. at 396 ("[W]here . . . the client discharges his attorney before entering into a settlement, the attorneys' right to compensation is measured by [q]uantum meruit, rather than by the provisions of the original retainer agreement."); accord Schonberger v. Serchuk, No. 89 Civ. 7094 (PKL), 1993 WL 299279, at *4 (S.D.N.Y. Aug. 4, 1993) ("Where an attorney withdraws or is discharged prior to the time of settlement, 'the attorney's right to compensation is measured by quantum meruit.'" (quoting Cook, 79 F.R.D. at 396)).  The applicable measure of fees, as between contracted-for contingency percentage and quantum meruit, "turns upon whether, at the time of the client's direct settlement with the defendant, the attorneys were still within his employ; or whether the attorneys had been discharged prior to the time of settlement."  Cook, 79 F.R.D. at 397.  "In the latter circumstance, the original contract of employment between attorney and client is not in effect at the time of settlement, its terms accordingly will not be enforced, and the attorneys are limited to the reasonable value of their services prior to the time of their discharge."  Id.

It is respectfully recommended that the motion for attorneys' fees be denied to the extent that Mr. Aronauer requests fees based on a lodestar calculation or for work performed or costs incurred after the date of settlement.  Mr. Aronauer appears to argue that he is entitled to such fees under the FLSA's fee-shifting provision.[9]  See Motion for Attorneys' Fees 1.  The Court disagrees.  "The FLSA fee-shifting statute provides for the payment of attorney's fees to a successful plaintiff, but does not create a right in favor of . . . [p]laintiffs' counsel, to that payment."  Galvez v. Aspen Corp., 967 F. Supp. 2d 615, 629 (E.D.N.Y. 2013) (emphasis in original).  As Mr. Aronauer does not have a personal right to fees under the FLSA's fee-shifting statute, his recovery is limited to the amount permitted under Section 475, which attaches the lien to the settlement, not to possible recovery waived by a plaintiff.  Activities not in furtherance of bringing about the settlement, judgment or award against which a lien is asserted, including a motion for a charging lien, "are not properly the subject of the charging lien."  Stair, 722 F. Supp. 2d at 271-72; see Antonmarchi v. Consol. Edison Co. of N.Y., No. 03 Civ. 7735 (LTS) (KNF), 2010 WL 3359477, at *4 (S.D.N.Y. Aug. 25, 2010) ("The Court finds that an award of fees . . . for the time [] spent pursuing . . . a charging lien[] is not reasonable.").

## V.   CONCLUSION

Based on the foregoing, the Court finds that a global settlement of $45,000.00 was reached, of which $16,000.00 was earmarked for attorneys' fees.  It is respectfully recommended that the settlement be approved as fair and reasonable under Cheeks.  The Court further respectfully recommends that Mr. Aronauer's motion for attorneys' fees be granted in part and

---

[9] Were the Court to evaluate the lodestar that would be reasonable to approve in this case, it is unlikely that it would exceed the one-third of the settlement because significant time would not be allowed, such as the denied sanctions motion, the premature and stricken collective action submissions, and the charging lien litigation.

denied part, that judgment be entered in the amount of $15,605.00 in favor of Mr. Aronauer and against Plaintiff Gustavo Santos primarily and Defendants E T & K Foods, Bet-Er By Far Meats, Inc. and Thomas Kaller secondarily, and that the Court order that the charging lien must be satisfied by Defendants as Mr. Santos cannot be located.  It is respectfully recommended that Defendants be ordered to pay $15,605.00 to The Law Offices of Jacob Aronauer within thirty (30) days of the District Court's decision if this report and recommendation is adopted.

## VI.   OBJECTIONS

This report and recommendation will be filed electronically.  The Court will also mail a copy to the last known address for Mr. Santos as indicated in ECF No. 57.  Written objections to this report and recommendation must be filed with the Clerk of Court within the time permitted after service of the report and recommendation, and in accordance with the Individual Rules of the District Judge.  Failure to file objections within the specified time waives the right to appeal any order or judgment entered based on this report and recommendation.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); Caidor v. Onondage Cnty., 517 F.3d 601, 604 (2d Cir. 2008).

Dated:  Brooklyn, New York
February 26, 2019

*Vera M. Scanlon*
Vera M. Scanlon
United States Magistrate Judge